558 So.2d 1238 (1990)
STATE of Louisiana in the Interest of THREE MINOR CHILDREN.
No. 89 CJ 1358.
Court of Appeal of Louisiana, First Circuit.
February 21, 1990.
*1239 Janice L. Kazmier, New Orleans, Walter P. Reed, Dist. Atty., Covington, for appellee.
James H. Looney, Office of Indigent Defender, Covington, for parents, Thomas and Lou McDermitt.
Before COVINGTON, WATKINS and SHORTESS, JJ.
SHORTESS, Judge.
On June 23, 1987, following what was styled "a 72-hour probable cause hearing," the trial court found the minor children, BH and MLM, to be children in need of care and ordered their custody to be continued with the State of Louisiana Department of Health and Human Resources, Office of Human Development (State). Earlier, on May 12, 1987, following a similar probable cause hearing, the minor child DH was ordered to be continued in the care of the State pursuant to parental agreement. After several other hearings, on April 12, 1989, pursuant to a hearing brought under the authority of LSA-R.S. 13:1601, the trial court terminated the parental rights of LM (mother) and TM (father), thus freeing the children for adoption. The parents have suspensively appealed to this court.
The record in this case includes transcripts of five separate hearings relative to these children: the probable cause hearing held on June 23, 1987, when the children were placed in the State's custody; a custody review hearing held on January 6, 1988, when the court determined that it was not feasible to reunite the children with their parents at that time and ordered custody to remain with the State; a dispositional review hearing held on August 3, 1988, after which the court ordered that the children be returned to their parents and vacated the State's custody but maintained State supervision over the family for six months; a hearing held on November 2, 1988, in connection with federal permanency placement requirement; and a final hearing held on April 12, 1989, on a petition to terminate parental rights. The minutes indicate several other hearings, but no additional transcripts are included.
FACTS
From these hearings, we have gleaned the following facts. TM and LM are the natural parents of BH, a boy born on July 7, 1983; DH, a girl born on July 23, 1984; and MLM, a girl born on November 12, 1985. The parents were not legally married at the time of BH's and DH's births, and the children took their mother's name. The parents were married at the time of MLM's birth. There is no question regarding the paternity of all three children. TM acknowledges them as his own, and the facts certainly verify this.
This family was well known to the State prior to the June 23, 1987, hearing when custody was awarded to the State. The State had for some time been attempting to improve the parenting skills of the parents but with little success. Finally, after repeated complaints from the child care center where the children went to school, the State brought proceedings to have the children adjudicated in need of care. At the initial hearing, the State's witnesses testified that the home was very unsanitary with dead roaches and other insects throughout the house, animal droppings and food on the floors throughout the house, and clothes strewn about. It was additionally learned that the youngest child, MLM, would continually go to school in the same diaper she left school in the day before. The mother was committed to Southeast Louisiana State Hospital on the same day the State intervened, so the father was not opposed to State custody because he could not take care of the children while the mother was in the hospital. At the conclusion of the hearing, the trial court found the children in need of care.
The January 6, 1988, hearing developed additional facts: that DH was taken into custody following a report of physical abuse, i.e., a black eye, which was verified by the State but resulted from an accident when she fell from her bed; LM was discharged from the hospital on July 23, 1987; that during this period, the family moved to a larger house but TM was unemployed so he was able to be at home and assist with housekeeping and the housekeeping *1240 standards improved some; that there were six to thirteen cats, with accompanying droppings, roaming through the house; that additionally there were opossums or raccoons in the attic which resulted in continuing complaints of extremely malodorous conditions; that the children's pediatrician found an intestinal parasite in MLM's stomach, a parasite commonly found in children who lived in unsanitary conditions; that based on her treatment of these children, she implored the court not to permit visitation to take place in the parents' home but at some more sanitary site; that visitation took place weekly; that it was supervised; that the children had been placed in foster homes with two of the children living together and DH living in a separate home; that when visitation was taking place, the parents appeared to show more attention to the youngest child than the other two; and that LM's medical diagnosis was schizo-affective disorder which indicated a limitation in her ability to parent. At the conclusion of the January 6 hearing, the court concluded that the State had exercised reasonable efforts to reunite the parents and children but felt that it would not be in the best interest of the children to do so at that time.
On August 3, 1988, the children had been in the State's custody for more than twelve months so a dispositional hearing was held. At said hearing, the following additional pertinent facts were developed: that TM found a job as a groomer with a local veterinarian and LM was following up on her mental health therapy and taking her medication; that the state had a psychological examination performed by Dr. Valerie Turgeons, who noted a significant level of depression in both parents; that the children continued to reside in the same foster homes and the State maintained a continuation of the custody arrangement because even with TM's job and LM's improvement, the State was concerned about their ability to parent the children; even after a separation of a year, it had been very difficult for the parents to maintain minimal sanitary standards in their house; and that the parents' personal hygiene continued to be poor.
Following this hearing, the trial court returned the children to the parents but ordered the State to continue its supervision. Before the month was out, however, the children were back in the State's custody because they had taken an accidental overdose of Tylenol which required emergency treatment at the hospital. While at the hospital, the children's pediatrician noticed innumerable insect and flea bites on all three, which prompted her to write to the trial court expressing her concern about the children's physical and emotional welfare. She felt that the parents were not capable of adequately parenting the children, who had suffered not only physical neglect, but also emotional neglect in the parents' home.
Thereafter, on November 2, 1988, the State petitioned for federal permanency placement because the children had now been in foster care for eighteen months. The state noted that it had worked with this family for four and one-half years and that the parents had never been able to maintain a minimally acceptable standard of living for any period of time, notwithstanding the State's utilization of all known community resources. The State felt that it was unable to rehabilitate the parents sufficiently in order to recommend that the children be returned to them; therefore, it sought court approval to proceed with efforts to terminate parental rights and make the children available for adoption.
The State conceded that the parents had always complied to some degree with its requests, but that although there were periods of improvement, the parents had never been able to sustain minimum compliance. The State also noted that marital discord had arisen which further aggravated the matter because of fighting and bickering at visitations.
The trial court then found that the parents did not have the capacity to act as such and ordered the State to proceed with the parental termination action.
On April 12, 1989, the termination proceedings were held. The facts, as developed by the State, amplified facts which we *1241 have discussed earlier. Joseph Bassett was the family's social service worker from January 1987 through August 1988, so all three children came into foster care while he was a caseworker. He described in detail the dirty home and deficient hygienic atmosphere surrounding the children, notwithstanding the fact that the State paid for the children's day care so LM could devote more time to housework. Student apprentice service was also made available to improve LM's general housekeeping and parenting skills. During this period, Bassett noted some improvement, especially with hygiene after the move to the larger house, but noted that problems with cleanliness were always present: they would improve for a time and then worsen. He also noted that both parents were faithful in attending visitations and that TM was always appropriate with the children, but that LM was less enthusiastic, showing less concern toward DH. Bassett documented the accidental Tylenol overdose after the children were returned in August 1988, as well as the fact that the parents had now separated.
Bassett was part of a team decision to request termination of parental rights because of these factors: (1) the State's providing a high level of services with minimal results over an extended period, (2) the mother's mental health, and (3) financial stress. At the time of this conference the team was thinking of both parents jointly and did not consider the parents separately.
The exhibits verify the State's evidence of substandard living conditions, as the June 1987 photographs document the State's contention of deplorable housekeeping and poor hygienic atmosphere.
Dr. Margie Strong was the children's pediatrician. She first saw them on referral from the State in 1986. At that time she noticed that MLM was malnourished and found the intestinal parasite (giardia). In March 1986 she noted severe developmental delays with both BH and DH. She noted that BH was almost three years old and as yet had no vocabulary and could hardly speak, and that DH was nineteen months old and had no vocabulary to speak of. Dramatic improvement was noted after the children were placed in an all-day day care center. In October 1986 she treated DH for a broken leg after she fell out of bed. On another occasion, DH had a black eye and a knot on her head. Dr. Strong saw all three children in the hospital after the Tylenol overdose which, fortunately, was not serious but did require MLM to have a stomach lavage. During this period she noted that all three children had "hundreds" of insect bites. Dr. Strong felt so strongly about these children and the minimal conditions in which they survived that she wrote to the trial court on two different occasions. On cross-examination she indicated that her major concern was the lack of parenting skills despite the repeated intervention by the State. She also testified that she had had very little communication with the father.
Medical testimony concerning the parents and children was also taken, both psychiatric and psychological. Dr. John Pratt, a psychiatrist, saw LM on November 10, 1988, at which time he diagnosed a bipolar disorder and borderline personality disorder which he described as a manic depressive psychosis which entailed vast mood swings displayed by pressurized speech, flight of ideas, and an explosive, bombastic nature. He felt that this condition was treatable but not curable and noted that patients usually respond well to Lithium. He felt that because of LM's hostility toward her husband at the time, he could hardly imagine the two of them being able to maintain much of a family life. His testimony developed that LM had an I.Q. in the upper 90's which put her in the normal range but that her emotional illness, which was psychotic at times, made her unable to provide an adequate home for the children. His prognosis was that she was not likely to change. Dr. Pratt did not examine TM or the children.
John Pleune, a clinical psychologist, evaluated the parents and the children. He found that the children functioned in the average range of intelligence and that they had no significant problems; that the two girls had strong positive feelings toward their foster parents, with the youngest *1242 completely bonded to her foster parents. He found that the boy showed the most attachment to his natural parents and had strong positive feelings toward both parents and foster parents.
Pleune saw LM on October 13. She presented herself as very unkempt, her hair poorly groomed, with body odor, very active physically, with much inconsistent behavior. His testing indicated a low average on the intelligence scale and weakness in verbal skills. He noted that LM and TM had been fighting in the waiting room before he saw LM and that each had negative things to say about the other. LM's diagnosis was schizoid disorder, similar to the bipolar disorder diagnosed by Dr. Pratt. Pleune said that when this disorder reaches the psychotic stage, the patient gets very upset and loses contact with reality. He found that LM had not done well with psychotherapy because she did not trust people. He felt it would be difficult for her to maintain long-term treatment and a positive attitude toward medication. He noted that LM stopped taking her Lithium because she felt it was harming rather than helping her. He felt her future chances were dependent on her ability to stay in therapy and on medication, but even assuming that she could, her prognosis was guarded.
Pleune saw TM on October 20, 1988, and found him angry at LM because she had a new friend and therefore might leave him. Pleune's testing found TM's intelligence to be within the average range. His problem seemed to be that he minimized all of his problems and held them within himself. He found that TM had appropriate concern for his children. Pleune made no diagnosis and indicated no therapy.
Pleune's overall impression was that it would be in the children's best interest not to be returned to the parents and that the foster parents be given an opportunity to adopt. In response to the trial court's questions, Pleune admitted he did not evaluate TM as an individual parent but felt that TM should have shown more concern for the children because of the situation with their mother. Pleune felt that since TM perceived caring for the children as solely his wife's responsibility and never intervened to assert himself, that it was not a safe environment for the children. On cross-examination he said that if the children were given to TM he would need some support system and that it would have to be well governed. He admitted that from the data he could not say whether TM could or could not function well as a single parent, but felt his behavioral pattern of passive parenting was not likely to change.
Lilly Walker is presently the children's case manager and was part of the decision to seek termination of parental rights, which she felt would be in the best interest of the children. She noted that it was difficult for the children to readjust to their foster homes after they had been returned to their parents in August of 1988. She also noticed that the parents had confrontations at visitations. She noted that TM would not help with the household chores, even after she had counseled him, because he felt it was a woman's job; in fact, he always blamed LM even though we "kept telling him that he needed to assert himself." She also noted that the mother's present residence was not an improvement and was not a permanent arrangement.
Michael Roach was appointed by the court as a special advocate in the case. He analyzed all available data and interviewed the various parties and prepared a report which concluded that it would be in the best interest of the children to terminate the parents' parental rights. He admitted, however, that he had not used the statutory requirements found in LSA-R.S. 13:1601, et seq., in formulating his opinion.
In defense, TM called his employer, Tom Gunn, for whom he went to work in November 1988. Gunn testified that he had a rather diverse business consisting of pressure washing and cart cleaning for grocery stores, repairs, and chemical sales. In describing TM's work ethic, Gunn indicated that he was very pleased with TM and found him loyal, punctual, honest, and a very hard worker; that for example he had worked 71 hours the previous week; that *1243 TM had indicated on several occasions his desire to get his children back and take whatever legal steps were necessary to do so; that TM was attempting to improve himself to show the State he was capable; he felt that TM had improved tremendously because he had hired him on as a laborer and now he is an assistant or associate foreman; and that very shortly he could be promoted to a full crew leader, with an increase of pay to about $350 a week.
TM testified and admitted that after he and LM regained custody of the children on August 3, 1988, there was a drop in minimal standards after the first week or so, and that he reacted badly when he just "threw his hands up in disgust." He felt that his job was to bring food into the house and provide for everyone and that his wife's job was to maintain the house and children, but that she stopped taking her medication and when that happened she started her mood swings. He indicated that he did try to help at times when he knew she was not feeling well; that it was not often because he was tired after work. He admitted that toward the end he just "gave up" but said he should not have, as it was a mistake on his part. In response to questions from the court relative to this August 1988 period and why he did not do more to prevent a recurrence of the substandard conditions, TM responded that he was still very immature at the time and had not set any goals for anyone; that he had only been worried about getting his children back and then when he had them he did not have a goal and fell apart again because he suffered from a very bad lack of motivation on "day to day things"; that his employer had noticed it and had been working with him and that is why he had been promoted. He also indicated that he always struggled financially and was just barely able to exist on the minimal, low-paying jobs he had, but that in his new job he makes over $260 per week and some of the financial strain has been reduced.
LAW
Upon completion of all the evidence, the trial court handed down oral reasons wherein it found that the case came under the provisions of LSA-R.S. 13:1601(B). It noted that subsection (B) contained two paragraphs and then found that under paragraph (1), that one year had passed since the rendition of a "child in need of care" judgment and that in its opinion both parents were unfit to rear the children. It also found that the requirements of paragraph (2) had been met, noting that neither parent had shown significant, substantial indication of reformation and both were unlikely to reform. It then terminated TM's and LM's parental rights and freed the children for adoption.
In reviewing a decision which terminates parental rights, we must keep in mind the requirements of LSA-R.S. 13:1601 and the burden of proof imposed by it under paragraph A of R.S. 13:1603: "Under Subsection B of R.S. 13:1601, Paragraphs (1) and (2) must be proven by clear and convincing evidence." In discussing a parent's due process rights under this statute, the Second Circuit in State in the Interest of CP, 463 So.2d 899 (La.App. 2d Cir.1985), has stated:
The determination of what procedural safeguards are required by due process depends upon the nature of the proceeding and the nature of the right or interest protected by the proceeding. Cafeteria and Restaurant Workers Union, Local 473 v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). The rights of parents to the companionship, care, custody and management of their children is a fundamental liberty interest warranting great deference and [vigilant] protection under the law. Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). Consequently, these proceedings which would irreversibly terminate a parent's rights must comport with the highest standard of due process, Lassiter v. Department of Social Services, [452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981)] supra; State in re: Delcuze, 407 So.2d 707 (La.1981).
We concur with the trial court's ruling that the operative paragraph for deciding this case is LSA-R.S. 13:1601. We also *1244 agree with its finding that all the conditions of that section must be met before a termination of parental rights can be ordered. We agree with the trial court's well-stated and very poignant reasoning in terminating the parental rights of the mother, LM, and affirm its decision as to LM for the reasons so adequately expressed by it.
While we agree that the State met its burden as to LM with clear and convincing evidence, we find that its proof as to TM was somewhat insufficient. We agree that the trial court's finding as to TM under the provisions of paragraph (1) was supported by clear and convincing evidence. We must also look at paragraph (2) of subsection (B) which requires a finding that the parent or parents have shown no significant substantial indication of reformation and are unlikely to reform. The trial court found that by TM's own admission he did not attempt to maintain a hygienic shelter for his children when he had his chance to do so after the August 3, 1988, hearing, but that he seeks another chance to do so because he now "sees the light." The court then asked rhetorically, "How long do we wait?" Finding that TM had been given an adequate length of time and had not met his parental responsibilities, it terminated his parental rights.
The record indicates that living together, these parents of marginal ability were simply unable to function as adequate parents and maintain minimal standards, and this had serious negative implications for the physical and emotional growth of their children. The evidence also indicates that these parents are now separated, that TM now has a decent job, has improved dramatically in his self esteem and has risen from a minimum wage laborer to an assistant foreman with corresponding increases in pay; that he realized that he was immature and gave up too easily, but that he wanted to make amends for that.
The standard of proof is "by clear and convincing evidence." Has the State proven by that standard that there is no significant, substantial indication of reformation or an ability to reform? Our review of the record indicates that TM has publicly acknowledged his prior mistakes in parenting and is now separated from his wife, maintaining his own individual domicile. The State has failed to show that TM, father of these children, living independent of his estranged wife, is incapable or unlikely to reform from his past passive parenting behavior. This statute requires proof of a higher caliber, "clear and convincing proof," because it was specifically designed to protect substantial substantive rights. The record, as presently constituted, does not satisfy this court that both conditions of subsection (B) have been proven by clear and convincing evidence. We also note that the record is silent as to what TM's present living arrangements are.
Accordingly, we reverse this judgment insofar as it terminated the parental rights of TM, but will maintain custody of the three minor children with the State. In accordance with subsection (B) of LSA-R.S. 13:1603, we hereby order the State to make a concerted effort to reunite these children with TM, using any and all social services at its disposal. We order the trial court to set a date for review within six months, and each six months thereafter, as necessary to determine what progress has been made in rehabilitating TM so that he might be reunited with his children. The initial six-month period shall begin to run on the date that this judgment becomes final.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS.