620 So.2d 1309 (1993)
STATE In the Interest of L.L.Z.
v.
M.Y.S.
No. 92-C-2975.
Supreme Court of Louisiana.
July 1, 1993.
Theresa A. Beckler, Drake, Beckler & Drake, Ponchatoula, for applicant.
Terrebonne Indigent Defender Bd., Charles G. Blaize, Houma, for respondent.
CALOGERO, Chief Justice.[*]
We granted this Writ to determine whether M.Y.S.'s parental rights over her *1310 child, L.L.Z., may be terminated pursuant to L.S.A.-R.S. 13:1601. The State claimed that M.Y.S.'s parental rights should be terminated because their proof met the requirements of both subsections (B) and (D) of R.S. 13:1601. We find otherwise and determine, for the following reasons, that the State has not satisfied its burden of proving, by clear and convincing evidence, the common requirements of subsections (B) and (D), that is, that M.Y.S. is unfit and has shown no reasonable expectation of reformation. Because the State has failed to prove this to be the case, M.Y.S.'s parental rights over her child, L.L.Z., may not be terminated.
M.Y.S. was 16 years old and 8 months pregnant when she ran away from her foster home in Illinois with her boyfriend. On July 3, 1984, the child, L.L.Z., was born in Oklahoma. Several days thereafter, M.Y.S. continued hitch-hiking to Louisiana, taking the baby along.
In late July 1984, M.Y.S. settled in Houma, Louisiana. At that time, the Department of Social Services (hereinafter, Agency) and the local police received a complaint that M.Y.S. was not properly caring for the child. Because the child, a little girl, appeared neglected, she was placed by the police in protective custody. She was then taken to the hospital and admitted for treatment.
On July 29, 1984, temporary custody was transferred to the State by the 32nd Judicial District (Juvenile) Court after it determined that the child, by then twenty-six days old, had been neglected. On August 2, 1984, at a 72 hour hearing, the court determined that the State should continue to maintain custody of the child.
On October 4, 1984, the Agency conducted the first family team conference to begin the process of reuniting M.Y.S. and the child. M.Y.S. did not attend the first conference or the second, held on January 14, 1985, because she had been sent back to Illinois where she found herself under foster care and unable to leave the state.
On February 6, 1985, with M.Y.S., still under foster care back in Illinois, the district juvenile court found the child neglected. The court rendered a judgment declaring that the child was a "child in need of care." In addition, the custody of the child was ordered continued with the State pending disposition of the case.
On July 15, 1985, the Agency held a third conference. By then, being seventeen and no longer under foster care in Illinois, M.Y.S. attended her first conference. At this conference the Agency discussed with M.Y.S. counseling, parenting skills, and loss of parental rights. Monthly meetings thereafter were scheduled between the mother and child. M.Y.S. did not attend the fourth conference held in January 1986. She provided no reason why she failed to attend the conference. In response, the Agency began to entertain the possibility of allowing the child to be adopted.[1]
M.Y.S. attended the fifth through twelfth conferences held by the Agency over a period spanning May 1986 through August 1989. In essence, M.Y.S. missed the first two conferences because they were conducted in her absence while she was in foster care in Illinois. She missed the fourth conference for unknown reasons. Otherwise, she attended the first twelve conferences over a period of some five years.
At the fifth conference, she was advised by the Agency that the child might be considered for adoption. At the sixth conference she was notified by the agency that she had not been attending counseling or parenting sessions and that the Agency intended to pursue the adoption of the child.[2] At the seventh conference held in May 1987, the Agency noted that the child was three years old and was becoming *1311 bonded with her foster parents. Nonetheless, the Agency maintained M.Y.S.'s monthly visits with the child.
On October 1, 1987, the district juvenile court ordered that the child be continued in the custody of the State for a period of twelve months, responsive to a motion by the Offices of Youth Services. The court found that reunification of the child with her mother was not in the child's best interest and that the child's existing foster care situation was more appropriate.
The eighth family team conference was held one month later in November 1987. At this conference, the Agency changed its plan from adoption to reunification of mother and child. This change of plans was based on information received by the Agency that M.Y.S. had begun making an effort toward trying to provide a home for the child. The Agency advised M.Y.S. of the trauma the child would experience regarding the separation from her foster parents if she and the child were reunited. She was also informed of the need to attend parenting classes and mental health counseling, how to handle stress and substance abuse, and the need for a stable income and adequate living conditions. She was encouraged to continue to visit the child monthly to establish a relationship and keep the Agency informed of any changes, such as her having to leave the state.
The ninth conference was conducted in April 1988. The Agency expressed concern that she was not attending Parents Anonymous or Alcoholics Anonymous.[3] In addition, she was advised that her housing situation was inadequate. It had deteriorated to a point that there was no room for another child. She was, at that time, living in a two bedroom house. In response to the Agency's evaluation, M.Y.S. and her family moved to a three bedroom trailer.
At the tenth conference M.Y.S. was again notified that the Agency was aware that she was still not attending parenting classes or counseling sessions. At this conference, the Agency decided to reexplore the possibility of adoption of the child because the Agency concluded, based on evaluations it had received, that the child had been with the foster parents since she was twenty six days old and that it was in the best interest of the child not to remove her from that environment.
At the eleventh conference, held in February 1989, the Agency found that M.Y.S.'s overall situation was improving and that she was visiting the child regularly, including weekend visits without major incident.
However, during this time the Agency determined that the child had become more attached to and had bonded with her foster parents although she had developed a relationship with her mother. Consequently, on April 12, 1989, the Agency had the custody of the child transferred from the State to the foster parents, yet allowed M.Y.S. reasonable visitation rights.
At the twelfth family team conference held in August 1989, the Agency noted that the visits between M.Y.S. and the child were going well.
M.Y.S. did not attend the thirteenth conference held in February 1990, although her husband did in her place. Because of her absence at this conference, the Agency included a provision in the case plan that if M.Y.S. disappeared for a four month period of time, abandonment proceedings would be considered. M.Y.S. likewise did not attend the fourteenth conference held in August 1990.[4] As a result of her absence from these two consecutive conferences, the Agency began to explore the possibility of terminating her parental rights.
*1312 M.Y.S. did attend the fifteenth conference conducted in February 1991. The Agency informed her of its change of plans; that it had decided to reconsider adoption for the child. The Agency informed her that she did not have a stable home and could not care for the child. Despite the Agency's change in plan, M.Y.S.'s visitation rights were continued while the Agency requested a hearing regarding possible adoption of the child.
On August 8, 1991, the Agency filed a petition to terminate M.Y.S.'s parental rights contending that she was unfit; that she was unable to reform; and that the Agency had made reasonable efforts to reunite mother and child.
The final family team conference took place on August 20, 1991, at which time M.Y.S. was informed of the action taken by the Agency to terminate her parental rights and that no further conferences were to be scheduled. She was allowed, however, to have visits with the child until October 3, 1991.
On October 23, 1991, the district juvenile court conducted a hearing on the State's request for termination of M.Y.S.'s parental rights. The judge concluded that based on the evidence presented by the State, M.Y.S.'s parental rights should be terminated.[5] M.Y.S. appealed to the First Circuit Court of Appeal which reversed the district court's judgment. That court determined that the State had not proved the requirements necessary for termination of parental rights under R.S. 13:1601.[6] The State then sought, and we subsequently granted, this Writ of Certiorari to determine whether the State had indeed proved that M.Y.S.'s parental rights should be terminated pursuant to R.S. 13:1601.
L.S.A.-R.S. 13:1600-1606 establishes a method by which parental rights may be terminated.[7] R.S. 13:1602 provides the procedure governing the process:
(A) The court of proper jurisdiction upon the filing of the petition for the termination of parental rights shall order a hearing and set the date thereof for the purpose of adjudicating whether the rights of the parent should be terminated...
(D) The district attorney or the appointed attorney for the child must prove that the child has been abused or neglected or the other elements enumerated in R.S. 13:1601 exist, and that the best interest of the child dictates termination of parental rights ...
R.S. 13:1603 sets forth the burden of proof on the State before parental rights may be terminated. The section states in pertinent part:
(A) Whenever the court of proper jurisdiction finds that the allegations of Subsection A, B, C, D, E, or F of R.S. 13:1601 are proven true by evidentiary standards set forth in this Section, it may order the termination of parental rights of the parent or parents against whom the allegations are proven ...
Under Subsection B of R.S. 13:1061, Paragraphs (1) and (2) must be proven by clear and convincing evidence.
. . . . .

*1313 Under Subsection D of R.S. 13:1601, Paragraphs (1), (2), (3), and (4) must be proven by clear and convincing evidence.

. . . . .
R.S. 13:1601 contains Subsections A through F, each with its own set of requirements that must be proven, as dictated by R.S. 13:1603, before a parent's parental rights may be terminated. R.S. 13:1601 states in pertinent part:
The court on its own motion may order that the district attorney petition, or the district attorney in his discretion may petition, for the termination of parental rights of the parent or parents of an abused, neglected, or other child within a juvenile court's jurisdiction, when the grounds set forth in the petition meet all the conditions of Subsection A, B, C, D, E, or F of this Section ...
A. . . .
B. (1) One year has passed since the rendition of an abuse or neglect judgment or child in need of care judgment, as defined in R.S. 13:1600(7), pursuant to the Code of Juvenile Procedure, and in the opinion of the court the parent is unfit to rear the child.
(2) The parent or parents have shown no significant substantial indication of reformation and are unlikely to reform.
C. . . .
D. (1) The child has been in the custody of a child welfare department or other person, pursuant to a judicial order, for a period of at least one year.
(2) The child was removed from the custody of the parents by judicial order due to the parent's abuse or neglect of the child.
(3) The parent is unfit to retain control and there is no reasonable expectation of reformation on the part of the parent or parents.
(4) The child is an abused or neglected child, the Department of Health and Human Resources has made every reasonable effort under the circumstances to reunite the child with his parents, and the department recommends that it would not be in the best interest of the child to be reunited with his parents.
E. . . .
F. . . .
The remaining three sections of R.S. 13, i.e., 1600, 1604, and 1605, complete the scheme for terminating a parent's parental rights. R.S. 13:1600 provides statutory definitions of some of the terms used in the text of R.S. 13:1601. R.S. 13:1604 allows a parent whose parental rights have been terminated the right to a suspensive appeal. R.S. 13:1605 provides the conditions that must exist before a court may allow the adoption of a child whose parent or parents have had their parental rights terminated.
The termination of parental rights is a severe and terminal action and to permit it the State must satisfy an onerous burden of proof. State In Interest of JML, 540 So.2d 1244 (La.App. 3 Cir.1989). Nonetheless, the evidence presented by the State "need only satisfy the requirements set forth in any given subsection." State In Interest of JH v. RFH, 572 So.2d 629, 631 (La.App. 3 Cir.1990). However, "all the conditions of that section must be met before the termination of parental rights can be ordered." State In Interest of Three Minor Children, 558 So.2d 1238, 1244 (La. App. 1 Cir.1990). Therefore, before parental rights can be terminated, the State must prove, by no less than clear and convincing evidence, that all the elements of at least one subsection of R.S. 13:1601 A through F have been met.[8]
As noted, R.S. 13:1601 provides six subsections which delineate the specific grounds which, if proven, permits termination of a parent's parental rights. The *1314 State did not rely upon subsections A, C, E, or F, nor allege the elements of these subsections.[9]
Therefore, the only remaining subsections that might apply in the case at hand are Subsections B and D. These are the two subsections that the State relied upon in seeking to have M.Y.S.'s parental rights terminated.
Under Subsection B, the State must prove three elements by clear and convincing evidence. First, it must prove that one year has passed since the child was adjudged to have been abused or neglected or a child in need of care. Second, the parent must be unfit to rear the child. Third, the parent or parents must be shown to have "no significant substantial indication of reformation" and be "unlikely to reform."
Under Subsection D, the State must prove six elements by clear and convincing evidence and make one recommendation. First, the child has been in custody of the child welfare department or other person pursuant to a judicial order for at least one year. Second, the child was removed from the parent's care by judicial order because of abuse or neglect. Third, the parent is unfit to retain control of the child. Fourth, no reasonable expectation of reformation on the part of the parent exists. Fifth, the child is an abused or neglected child. Sixth, the Department of Health and Human Resources has made "every reasonable effort under the circumstances to reunite the child and parent." Finally, the State must recommend that it would "not be in the best interest of the child to be reunited with the parents."
In this case, we find that the State has not proved all of the elements of either subsection by clear and convincing evidence. Regarding Subsection B, the State has only proved by clear and convincing evidence that one year has passed since the rendition of the judgment declaring the child abused, neglected, or a child in need of care. They have not proved that M.Y.S. was "unfit to rear the child" or that she had shown "no significant substantial indication of reformation" and that she was "unlikely to reform."
Regarding Subsection D, the State has only proved by clear and convincing evidence that the child has been in the custody of the child welfare department or other person pursuant to a judicial order for at least one year and that the child was removed from the custody of the parent by judicial order because of the parent's abuse or neglect. Also, of course, the State did recommend that it was not in the best interest of the child to be reunited with her parent. However, the State did not prove that M.Y.S. was "unfit to retain parental control" or that there was "no reasonable expectation of reformation" on her part.
The definition of "unfit" is provided in R.S. 13:1600(6) which was amended and reenacted by Acts 1986, No. 234, Section 1 provides three criteria by which a parent may be found "unfit". It states:
(6) "Unfit" refers to a parent:
(a) Who has abused a child by inflicting physical or mental injury which causes severe deterioration to the child, or who has sexually abused, exploited, or overworked a child to such an extent that his or health, moral, or emotional wellbeing is endangered; or
(b) Who has consistently refused to provide reasonably necessary food, clothing, appropriate shelter, or treatment either by medical care or other health services in accordance with the tenets of a well recognized religious method of healing with a reasonable proven record of success. Financial inability alone shall *1315 not constitute grounds for termination of parental rights; or
(c) Whose medical or emotional illness, mental deficiency, behavior or conduct disorder, severe physical disability, or chemical dependency makes the parent unable or unwilling to provide an adequate permanent home for the child at the present time or in the reasonably near future based upon expert opinion or based upon an established pattern of behavior.
Our review of the record leads us to conclude that the State did not prove that M.Y.S. met either prong of the "unfit" test provided in R.S. 13:1600(6). The State did not allege nor did it produce any evidence that M.Y.S. had inflicted any physical or mental injury which caused severe deterioration of the child. Furthermore, the State did not allege or prove that M.Y.S. had sexually abused, exploited, or overworked the child.
In its petition, the State did allege that M.Y.S. refused to provide reasonably necessary food, clothing, and shelter because she purportedly "frequently left the state." The State did introduce testimony that M.Y.S. did leave the state on two occasions for periods of several months. The first time was when she was returned to Illinois and put in foster care. The second time was when she returned to Illinois because her grandmother was dying and she remained there until her grandmother's death. Nonetheless, although the two absences were for periods of several months, the evidence presented by the State did not indicate that M.Y.S. "frequently" left the state.
More importantly, no testimony or evidence was introduced by the State at the trial to substantiate the allegation that M.Y.S. refused to provide food, clothing or shelter to the child. On the contrary, the State's only witness, Martha Walker, testified that no complaints were received by the Agency regarding M.Y.S.'s relationship with the child other than the original complaint when the child was twenty-six days old. Furthermore, Walker provided no testimony that indicated that M.Y.S. had abused or neglected the child or failed to provide necessities to her child during any of the permitted visits between M.Y.S. and the child.
Finally, no expert opinion was introduced by the State that M.Y.S. had a mental or emotional illness, mental deficiency, behavior or conduct disorder, severe physical disability, or chemical dependency. Furthermore, the State failed to put forth any evidence that M.Y.S. exhibited an established pattern of behavior that was detrimental to the child or that she was unable or unwilling to provide an adequate home for the child.
The State's witness, Martha Walker, testified that M.Y.S.'s visits with the child began with M.Y.S. taking the child to the park or shopping. Eventually, the visitations progressed to weekend visits. Walker stated that the visits went well and that "there was nothing outstanding that would indicate that L.L.Z. was in any danger." Walker further testified that L.L.Z.'s foster parents were more affluent than M.Y.S. and, as a result, the foster parents' residence was "different" from M.Y.S.'s residence. However, she made no assertions that M.Y.S. was unable or unwilling, at any time, to provide an adequate home for the child. Moreover, M.Y.S. testified that she loved her child and that although she had missed some of the best parts of watching her child grow up, she was looking forward to eventually getting her child back and enjoying their lives together.
Our jurisprudence has discussed the characteristics of an unfit parent. In State In Interest of JH v. RFH, 572 So.2d 629 (La.App. 3 Cir.1990), writ denied, 575 So.2d 374 (La.1991), the court found the parents of several children unfit because they were unable to provide appropriate training to their children because the father was serving a life sentence in prison and the mother had established a pattern of chemical dependency. In addition, the parents consistently refused to provide necessities to the children and were unwilling and unable to provide a safe, adequate, and permanent home for the children.
*1316 In State In Interest of TK, 568 So.2d 636 (La.App. 3 Cir.1990), the court determined that the mother was unfit because her emotional illness, behavior or conduct disorder, or chemical dependency made her unwilling or unable to provide a safe, adequate, and permanent home for her children. In addition, the mother refused to admit that there had been sexual abuse against the children or that she had a problem with substance abuse.
In State In Interest of C.L.R. v. Russo, 567 So.2d 703 (La.App. 3 Cir.1990), the court concluded that the mother was unfit because she was mentally retarded, lacked social skills, lacked parenting skills, was difficult to work with in making improvements, had obviously neglected the children, and failed to provide suitable housing.
Finally, in State In Interest of C.D., 558 So.2d 806 (La.App. 5 Cir.1990), the court opined that the mother was unfit because of her repeated incarcerations and sparse work history, her lack of progress since her children had been removed from her home, and her inability and unwillingness to provide an adequate permanent home for her children.
Therefore, jurisprudentially speaking, the characteristics for finding a parent unfit are based upon a parent's incarceration for life, debilitating mental disorder, continued substance abuse, continued evidence of neglect or abuse, or failure to provide adequate and permanent housing for the children. None of these characteristics exist in this case.
The State in its petition alleged that M.Y.S. had a mental deficiency, a behavior or conduct disorder, a borderline personality disorder, serious emotional problems and implied that she had a substance abuse problem. However, the State produced no witnesses or evidence at trial to support these allegations. Furthermore, no evidence or testimony was produced demonstrating that M.Y.S. abused or neglected her step-children or her own child during their visits. Moreover, no evidence was produced to show that M.Y.S. continually failed to maintain adequate or permanent housing for the children. In the one incident when M.Y.S. was informed that her two bedroom house was insufficient for the child, she moved with her family to a larger three bedroom trailer. Finally, since her relocation to Louisiana from Illinois, M.Y.S. has maintained her permanent home in the same vicinity as the child.
Accordingly, we find that the State has not proven by clear and convincing evidence that M.Y.S. is "unfit" either under the statutory definition of the term or under the jurisprudentially established criteria.
We further determine that the State did not prove that M.Y.S. had shown no indication of reformation or that she was unlikely to reform. R.S. 13:1600 does not provide a statutory definition of "reformation." However, several cases have addressed the issue of a parent's indication of reformation.
In State In Interest of TK, 568 So.2d 636 (La.App. 3 Cir.1990), the court found that the mother had not reformed and was not likely to reform when she denied that there had been sexual abuse against her daughter and continued to live with the abusing boyfriend and his children. The mother claimed that to continue to live with the boyfriend would cause no harm to her children.
Furthermore, in State In Interest of N.T., 560 So.2d 63 (La.App. 5 Cir.1990), the court determined that there was no reasonable expectation of reform because the mother had a long history of substance abuse and her physician testified that successful treatment would require an intense, closely monitored program.
On the other hand, evidence of reformation by the parent was found in State Through Dept. of Health and Human Resources In Interest of CAB v. EB, 504 So.2d 162 (La.App. 2 Cir.1987), when the court found that the mother had cooperated with state officials and had improved, though she was still not capable of protecting the children from their father's alleged abuse.
*1317 Finally, the issue of "no significant, substantial indication of reformation or an ability to reform" was discussed in State In Interest of Three Minor Children, 558 So.2d 1238 (La.App. 1 Cir.1990). The court noted that the "State has failed to show that TM, ... is incapable or unlikely to reform from his past passive parenting behavior. This statute requires proof of a higher caliber, `clear and convincing proof, because it was specifically designed to protect substantial substantive rights." Id. at 1244.
The jurisprudence indicates to us that there is no expectation of reformation and no likelihood of reformation when the parent exhibits prolonged and consistent abusive or negligent behavior or a long history of substance abuse. Furthermore, conduct such as mental or behavioral disorders which cause a parent to refuse to cooperate with the authorities in addressing the needs of the child would also suggest that no reasonable expectation of reformation exists and that it is unlikely that the parent will reform. However, a reasonable expectation of reformation is found to exist if the parent has cooperated with state officials and has shown improvement, although all of the problems that exist have not been eliminated.
The latter is the situation in this case. According to the record, in the beginning of the reunification process, M.Y.S. did not work with Agency officials as expected. Part of the reason was that she was still under foster care in Illinois, part was because she was young and immature. However, we note that as the conferences continued over the years and M.Y.S. matured, she became more cooperative with the Agency to a point where she was allowed weekend visits with the child and was being prepared by the Agency for reunification.
The evidence produced at trial demonstrated that even the Agency found that M.Y.S. was more cooperative and she was showing improvement. According to Gail Diggs, M.Y.S.'s case worker, M.Y.S. was cooperative in learning how to keep house, deal with her finances, and provide food and shelter for her step-children. Even the trial judge, in his oral reasons for judgment regarding the termination of her parental rights, admitted that over the last six months to a year prior to the trial, M.Y.S. had "stabilized."
We determine that based on the evidence before us the State failed to prove by clear and convincing evidence that M.Y.S. showed "no reasonable expectation of reformation" or that she was "unlikely to reform."
The State's proof thus failed in both particulars, unfitness and no reasonable expectation or likelihood of reformation. We conclude therefore that the State did not prove the two elements common to sections 1601(B) and 1601(D) of R.S. 13. Because the State did not prove these elements, it has not met its burden of proving all of the elements of any one of R.S. 13:1601's subsections. Parental rights, consequently, may not be terminated.

DECREE
For the above reasons, we find that the State has failed to prove, by clear and convincing evidence, each element of R.S. 13:1601(B) and/or R.S. 13:1601(D). Accordingly, M.Y.S.'s parental rights over the child, L.L.Z., may not be terminated.
JUDGMENT OF COURT OF APPEAL AFFIRMED.
KIMBALL, J., dissents and will assign reasons.
NOTES
[*] Dennis, J., not on panel. For the procedure employed in assigning cases after January 1, 1993, to rotating panels of seven justices, see State v. Barras, 615 So.2d 285 (La.1993).
[1] M.Y.S. had no contact with the Agency from September 1985 through May 1986 except for one instance in February 1986 when she was contacted by the Agency and advised of the Agency's case plan for the child. The Agency informed her that she had not been supporting nor maintaining a relationship with the child.
[2] By this time M.Y.S. was married to P.S. and living with him and his 4 children.
[3] M.Y.S. attended Alcoholics Anonymous twice but stopped going because she did not have an alcohol or drug problem. She attended the intake at the Mental Health Center but was told they could not offer her any assistance until she and child were reunited. She did not attend Parents Anonymous because she felt that she was "learning" parenting by raising her four step-children.
[4] According to M.Y.S.'s testimony, she returned to Illinois because her grandmother was dying. She claimed she stayed with her grandmother until she died then took care of her grandmother's affairs returning to Louisiana when she had finished.
[5] The court also ruled that the child had been abandoned by her biological and legal father.
[6] The court of appeal determined that the State had not proved "by clear and convincing evidence, that [M.Y.S.] is unfit to retain parental control ...; that there is no reasonable expectation of reformation on her part; and that every reasonable effort has been made under the circumstances to reunite this child with her mother." Slip Op. at 14, No. 92-CJ-0697 (Oct. 16, 1992).
[7] Originally, Title 13, Sections 1600-1607 of the Revised Statutes contained Acts 1960, No. 223, Sections 1-9 and made provisions for a juvenile court for St. Bernard Parish. The statutes were repealed by Acts 1964, No. 314, Sec. 1, effective December 31, 1965. At the 1974 legislative session, Act 566 was introduced to amend Chapter 6 of Title 13 of the Louisiana Revised Statutes of 1950 by adding new sections designated as R.S. 13:1600-1605 to provide for the judicial termination of parental rights over children; establish grounds for termination of parental rights; and establish the procedure for such termination. Several minor amendments have been added to these statutes, but they have remained essentially the same as when they were enacted in 1974.
[8] According to R.S. 13:1603 the paragraphs of each subsection must be proved by clear and convincing evidence, except Subsection A, Paragraph 1 and Subsection C, Paragraph 1 which both must be proved beyond a reasonable doubt. Subsection A, Paragraph 1 provides: "The abuse or neglect of the child by the parent or parents results from a crime committed against the person of the child or when a parent is an accessory to such a crime." Subsection C, Paragraph 1 provides: "The abuse or neglect of the child by the parent or parents results from grossly negligent behavior which directly harms the child."
[9] R.S. 13:1601(A) deals with the abuse or neglect of a child which results from the commission of a crime or cruel or inhuman treatment. R.S. 13:1601(C) deals with the abuse or neglect of a child as a result of "grossly negligent behavior which directly harms the child", coupled with persistent cruel and inhuman treatment of the child which is below any reasonable standard of decency and the parent is unfit to retain parental control with no reasonable expectation of reformation by the parent. R.S. 13:1601(E) addresses situations where a parent has been incarcerated in a state or federal prison and refuses to provide a plan of care for the child. Finally, R.S. 13:1601(F) applies to situations where the child has been removed from the custody of the parent because of the parent's mental illness, retardation, or substance abuse.