# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 08-657


## STATE IN THE INTEREST OF H.G. AND C.G.[1]


**********

APPEAL FROM THE
THIRTY-THIRD JUDICIAL DISTRICT COURT
PARISH OF ALLEN, NO. JV-2006150
HONORABLE JOEL GERARD DAVIS, DISTRICT JUDGE

**********

## ULYSSES GENE THIBODEAUX
## CHIEF JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Oswald A. Decuir, and Marc T. Amy, Judges.


**AFFIRMED.**


**John Erwin Demoruelle**
**Allen Parish District Attorney Office**
**P. O. Box 839**
**Oberlin, LA 70655**
**Telephone: (337) 639-2641**
**COUNSEL FOR:**
**Appellee - J.G.**

**E. David Deshotels**
**Deshotels, Mouser & Deshotels**
**P. O. Box 399**
**Oberlin, LA 70655**
**Telephone: (337) 639-4309**
**COUNSEL FOR:**
**Appellee - T.R.**

---

[1]The child, K.G., was erroneously designated as "[C.G.]" in the Department of Social Services' initial pleadings filed with the trial court. The child's birth certificate and the final judgment rendered by the trial court, accurately indicate that the child's initials are "K.G." Accordingly, "K.G." will be used throughout this opinion.

**Nicholas Pizzolatto, Jr.**
**827 Pujo Street**
**Lake Charles, LA 70601**
**Telephone:  (337) 439-9866**
**COUNSEL FOR:**
**Appellant - State of Louisiana, Department of Social Services**

**Chad Guidry**
**P. O. Box 447**
**Kinder, LA 70648**
**Telephone:  (337) 738-2280**
**COUNSEL FOR:**
**Appellee - H.G. and K.G.**

**THIBODEAUX, Chief Judge.**

The Louisiana Department of Social Services (DSS) has appealed the trial court judgment that dismissed its petition for the involuntary termination of the parental rights of appellees, T.R. and J.G., to their two minor children. DSS contends that it established by clear and convincing evidence that termination of the father's parental rights was warranted based on his statutory abandonment of the children under La.Ch.Code art. 1015(4). DSS also contends that the trial court erred in failing to find that involuntary termination of the parental rights of both appellees was warranted by La.Ch.Code art. 1015(5) because it was established at trial that there is no reasonable expectation of significant improvement in either parent's condition or conduct in the near future. DSS claims this was established via evidence of the children having been in DSS' custody for approximately seventeen months as of the termination hearing date, as well as the parents' failure to ever substantially comply with the court-approved case plan for services during that period.

We conclude that DSS failed to prove by clear and convincing evidence that there is no reasonable expectation of significant improvement in the parents' conditions in the near future. Therefore, the trial court's findings are not manifestly erroneous and the judgment is affirmed.

I.

**ISSUES**

1.  Did the trial court commit manifest error by finding that the father had not missed a sufficient number of visits with the children to constitute abandonment pursuant to La.Ch.Code art. 1015(4)?

2.  Did DSS prove by clear and convincing evidence that there is no reasonable expectation of significant improvement in the parents' conduct or condition in the near future, considering the ages of the children and their need for permanent placement, via its proof

that the parents had failed to substantially comply with the case plan during DSS' custody of the children in excess of one year?

## II.

## <u>FACTUAL BACKGROUND</u>

The appellees in this case are T.R., the twenty-five year-old mother, and J.G., the twenty-six-year-old father, of a six-year-old boy, K.G., and a seven-year-old girl, H.G. The parents are unmarried and were not living together when DSS responded to the report that forms the basis of this case.

DSS' Allen Parish Office of Community Services (OCS) received a report on the evening of September 18, 2006, stating that the mother, T.R., had left her children, who were ages four and five at the time, at her Kinder, Louisiana apartment in the care of two babysitters, ages twelve and fourteen, for about thirty-six hours. The reporter complained that the condition of T.R.'s apartment was not fit for children to live in and that T.R. could not be located when it was time for the babysitters to return home.

A Kinder Police Department officer, Corporal Nick Lafleur, conducted a "welfare check" at T.R.'s apartment shortly after the complaint was received and opined that the home was not in a suitable living condition for children. He accompanied the local OCS worker, Melissa Beach, back to the home that evening, and she arrived at the same conclusion. In her Affidavit in Support of Instanter Order that was subsequently submitted to the trial court, Ms. Beach attested to having made the following observations while at the apartment:

> Upon entering the apartment, a foul odor could be detected. Upon entering the bedroom, Melissa Beach observed clothes covering the floor. Ms. Beach could not tell if the clothes were dirty or clean. On the mattress where [K.G.] sleeps, there were urine stains. On the floor above the

mattress, Ms. Beach observed a dirty diaper filled with urine. Upon entering the bathroom, Ms. Beach observed feces along with used toilet paper in the sink and along the sink counter. On the floor of the bathroom there was blood and toilet paper. In the bathtub, there were dirty towels and a dirty diaper with what looked like feces in it. Upon entering the kitchen, Ms. Beach observed dirty dishes with old food on them stacked next to the sink. In one half of the sink were dirty dishes in water. The water looked like it had been in the sink for a few days. It had white stuff floating in the sink among the dishes. In the refrigerator, there was an open pack of ground meat. There were open cans of chili and beef ravioli in the refrigerator. Melissa Beach took pictures of the apartment on 9/19/2006.

On 9/18/2006 9:25 pm, Melissa Beach interviewed [T.R.]. She stated that the apartment was not in this condition when she left yesterday, Sunday, September 17, 2006 around 5:00 pm or 6:00 pm. She left a fourteen-year-old and a twelve-year-old babysitting [H.G.] and [K.G.]. She stated that she went to Lake Charles to see her boyfriend. She sent back an eighteen-year-old friend named Sam to come to the apartment around 9:00 pm or 10:00 pm on September 17, 2006 to babysit [H.G.] and [K.G.] for the night. [T.R.] did not know the last name of Sam, her address, or phone number. Sam was supposed to send the fourteen-year-old and the twelve-year-old home. Sam never showed up at [T.R.]'s apartment on September 17, 2006 or September 18, 2006.

Based on these observations, an Oral Instanter Order was issued that night, granting temporary custody of the children to DSS. The children were subsequently adjudicated as children in need of care and placed in foster care due to inadequate shelter and lack of adequate supervision.

Prior to the parental rights termination hearing, approximately seventeen months passed and four family case plans were approved by the trial court. The plans were all substantively the same and initially set forth the goal of reunification of the children with the parents. However, it was noted in the family's initial case plan that in the event reunification was not achieved by the end of the following year—

3

December 2007—the permanent placement goal would be changed to adoption and a termination of parental rights action would be instituted.

The case plans required the parents to do the following: (1) participate in family and/or psychological assessments to determine each of the parents' ability to provide a "safe, stable, and nourishing" home environment; (2) participate in Nurturing Parent classes, after mental health or substance abuse treatment plans are instituted, if any, and are followed successfully;[2] (3) for six months, maintain a residence with adequate space for the children and adequate furniture to accommodate the entire family; (4) for six months, maintain employment/income sufficient to provide for the family's needs; (5) maintain the court-approved visitation contract; and, (6) within five days, give case workers notice of changes in living arrangements, employment, marital status, and arrests or incarcerations.

In October 2007, after twelve months of the children's placement in State care, DSS filed a petition seeking to terminate both parents' parental rights. It was undisputed at the trial that neither parent had complied with all aspects of the case plan prior to the termination hearing.

The mother, T.R., remained unemployed and had not maintained her own residence with adequate space and furnishings to accommodate the children for a consistent six-month period, as the case plan required. As of trial time, she testified that she and her fiancé, J.L. (whom she began dating in the months following the children's placement in State custody), were temporarily living with a family, who had three children themselves, in their three-bedroom trailer. T.R. testified that she and J.L. planned to move into a one-bedroom duplex apartment, which she admitted did not have a separate bedroom space for her children. She claimed that when her

---

[2]The record does not contain any evidence of substance abuse by either parent during DSS' involvement with this family.

fiancé was able to earn more money,[3] they would move to a larger home that could accommodate her children as well; however, she did not give a certain date for such a move.

T.R. attended the majority of scheduled visits with her children. She attended twenty-seven of a total of forty scheduled visits with her children; she missed thirteen. Her excuse for the missed visits was primarily lack of transportation. At the termination hearing, although she stated that she had purchased a car, she continued to assert her lack of transportation for her failure to seek and/or obtain employment.

T.R. was also not compliant with the case plan's requirements for completion of a mental health evaluation and a substance abuse evaluation and any necessary treatment. In January 2007, shortly after the children were removed from her care and custody, T.R. participated in an initial psychological evaluation designed to assess her ability to properly parent her children. However, during the following year, she failed to comply with DSS' requirement that she also participate in a substance abuse assessment with one of two recommended sources and to undergo a mental health evaluation. These assessments and any possible subsequent treatments were prerequisites to T.R. receiving a referral to attend parenting classes. Consequently, none of these conditions had been met as of the date of trial.

She expressed a desire to have her children returned to her, but told the trial court that she needed additional time of approximately six months to further prepare. She explained to the trial court that her difficulties in complying with the case plan in the past had been caused by her "depression" and need to "get back on her feet" after finding herself single and responsible for the care of two children for

---

[3]Although J.L. did not testify at the trial, T.R. testified that he supported the couple with his earnings of approximately $400.00 per week doing construction work.

the first time in her adult life. She and J.G. had their first child when she was eighteen years old, and she stated that she had relied on him for financial support during their years of intermittent cohabitation; she considered herself a stay-at-home mother.

The children's father, J.G., was also not in substantial compliance with the case plan. J.G., who quit high school in the eleventh grade, was self-employed and claimed to have maintained employment intermittently over the year, performing carpentry and other odd-jobs for a living. J.G., however, never provided proof of his income to DSS during the children's time in State custody. Notably, he also testified that he did not provide financial support to T.R. or the children during their two-month separation immediately prior to the children being removed from T.R.'s apartment by DSS.

J.G., like T.R., also failed to maintain a stable home that would meet the requirements for the return of his children. Prior to and after the children's placement in foster care, he lived with his mother and other family members in a Federal Emergency Management Agency-issued (FEMA) trailer. It was filled to capacity and there were no sleeping accommodations for the children. He testified that he now lived in his father's three-bedroom home alone. He stated that the home had been visited by DSS workers and was suitable for the children. He further emotionally testified that he wanted to regain custody of his children and have them live with him.

At the time of the termination hearing, J.G. was awaiting a criminal trial, scheduled for September 2008, on unrelated felony charges. He was incarcerated on September 5, 2007, and released on February 21, 2008. During this approximate five-month period, he missed all scheduled visitations with his children. Prior to his incarceration, he attended 13 visits.

J.G. completed his psychological assessment and substance abuse assessment, but had not yet completed the eight-week drug treatment program that he was recommended to undergo. The substance abuse assessment consisted of a meeting with an employee of the Office of Addictive Disorders, but J.G. was not drug-tested; he admitted to having using drugs in the past, however. J.G.'s subsequent incarceration prevented him from enrolling in the eight-week program. Further, J.G. has not completed the mental health assessment required by the case plan as well. He blamed this delay on having to wait to receive a voucher for the cost of the assessment from DSS, which was never made available to him.

The social workers on this case described both parents as expressing love for their children and interacting appropriately with them during visits. The children were also described as "thriving" in their respective foster care placements. Both children exhibited aggression when initially placed in foster care homes, but by all accounts, those issues had resolved for both children as of the time of the termination hearing. The children also both exhibited certain developmental delays, but were receiving appropriate assistance in their pre-school class settings. No explanation for the cause of the delays was offered in the record. The foster care workers also testified that there had been no prior reports to DSS regarding inadequate care of these children prior to the report that led to their removal in 2006.

DSS claims that the placement of the children in foster care for more than one year and the lack of substantial compliance by either parent with the case plans for reunification signified that there was no reasonable expectation of significant improvement in the parents' condition in the near future. Consequently, DSS argued that it had established by clear and convincing evidence that involuntary termination of their parental rights was justified pursuant to La.Ch.Code art. 1015(5).

7

Moreover, DSS asserted that the parents' visitation records met the requirements for abandonment sufficient to justify the involuntary termination of parental rights as well, pursuant to La.Ch.Code art. 1015(4).

The trial court found that DSS had established by clear and convincing evidence that the children had been in State custody for more than one year and that the parents had not substantially complied with the court-approved case plans. However, the trial court found that DSS failed to prove that there was no reasonable expectation of significant improvement in the parents' condition or conduct in the future. The trial court also found that DSS failed to prove that the parents' visitations met the standard for abandonment pursuant to La.Ch.Code art. 1015(4). Accordingly, DSS' petition was dismissed, and DSS appealed.

III.

## LAW AND ANALYSIS

### *Proof of Abandonment*

Appellant, DSS, has only appealed the trial court's finding that the father, J.G., had not statutorily abandoned the children pursuant to La.Ch.Code art. 1015(4)(c). That article states:

**Art. 1015.  Grounds**

The grounds for termination of parental rights are:

. . . .

(4) Abandonment of the child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:

. . . .

(c) As of the time the petition is filed, the parent has failed to maintain significant contact with the child by visiting him or communicating with him for any period of six consecutive months.

According to DSS, it established that the father, J.G., had only appeared for fourteen out of forty scheduled visits with his children since their placement in foster care. The father was incarcerated for five and one-half months beginning in September 2007, and during that time missed all scheduled visits with the children. DSS argues that this compliance rate is "not significant contact with the child[ren] for any period of six consecutive months" and that the father's absence constitutes abandonment.

We disagree. The record does not clearly show that the father failed to visit with or communicate with the children for six consecutive months. He visited the children on the following dates: 10/11/06, 10/30/06, 11/20/06, 11/29/06, 12/18/06, 12/27/06, 2/09/07, 2/22/07, 3/08/07, 3/20/07, 5/31/07, 6/14/07, and on two additional dates thereafter, the dates of which are not documented in the record. Although it is undisputed that J.G. was incarcerated and unable to attend visits of the children for a five and one-half month period, the record is not clear as to when his last visits prior to his September incarceration occurred. Without this information, it is not established by clear and convincing evidence that J.G. "failed to maintain significant contact with his children by visiting or communicating with them for any period of six consecutive months." La.Ch.Code art. 1015(4)(c). Accordingly, the trial court's ruling in this regard is not manifestly erroneous.

### *Reasonable Expectation of Significant Improvement*

The grounds for termination of parental rights according to La.Ch.Code art. 1015(5) are:

Unless sooner permitted by the court, *at least one year has elapsed* since a child was removed from the parent's custody pursuant to a court order; there has been *no substantial parental compliance with a case plan for services* which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, *there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future*, considering the child's age and his need for a safe, stable, and permanent home.

(Emphasis added). Article 1036(D) of the Children's Code clarifies the assessment

of the reasonable expectation of significant improvement factor:

> D. Under Article 1015(5), lack of any reasonable expectation of significant improvement in the parent's conduct in the near future may be evidenced by one or more of the following:
>
> (1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.
>
> (2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.
>
> (3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.

As the supreme court stated in *State in the Interest of S.M.W., C.D.W.,*

*C.N.W., and E.S.W.*, 00-3277, p. 14 (La. 2/21/01), 781 So.2d 1223, 1233, the standard

of review applicable to these cases is the manifest error standard:

> It is well-settled that an appellate court cannot set aside a juvenile court's findings of fact in the absence of manifest error or unless those findings are clearly wrong. *In re A.J.F.*, 00-0948 (La.6/30/00), 764 So.2d 47, 61. Where there is conflicting testimony, reasonable

evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even when the appellate court may feel that its own evaluations and inferences are as reasonable as those of the trial court. *Id*.; *Rosell v. ESCO*, 549 So.2d 840 (La.1989). [I]f the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. *Rosell, supra* at 844. Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. *Id*. In its manifest error review, it is important that the appellate court not substitute its opinion when it is the juvenile court who is in the unique position to see and hear the witnesses as they testify. *In re A.J.F.*, *supra* at 62. The trier of fact is not disadvantaged by the review of a cold record and is in a superior position to observe the nuances of demeanor evidence not revealed in a record. *Id*.

In this case, we cannot find that the trial court committed manifest error by ruling that DSS did not prove by clear and convincing evidence that there was no reasonable expectation of significant improvement in the parents' condition or conduct. None of the statutory criteria set forth in La.Ch.Code art. 1036(D) are clearly satisfied under the facts of this case. Additionally, as the supreme court stated in *State in the Interest of L.L.Z. v. M.Y.S.*, 620 So.2d 1309, 1317 (La.1993), "a reasonable expectation of reformation is found to exist if the parent has cooperated with state officials and has shown improvement, although all of the problems that exist have not been eliminated." The facts as presented in this record show that although there has been less than substantial compliance with the case plan, certain requirements of the plan have been undertaken by both parents and/or completed. Accordingly, under the facts of this case, the trial court's findings are not clearly wrong or manifestly erroneous.

11

IV.

## **<u>CONCLUSION</u>**

The judgment of the trial court, dismissing the Petition for Certification for Adoption and Termination of Parental Rights, is affirmed.

All costs are assessed to the State of Louisiana, Department of Social Services.

**AFFIRMED.**