11 STEWART, J.
This is an appeal from a judgment terminating the parental rights of T.S. to the minor children, M.A.S. and R.S. At issue is whether the State proved by clear and convincing evidence that there exists no reasonable expectation of reformation in the near future for T.S. so as to justify termination of her parental rights. For the reasons which follow, we affirm the judgment of termination.
FACTS
By instanter order of June 15, 2001, the minor child M.A.S., born August 8, 1999, was removed from the custody of his mother, T.S., and placed in the custody of the State of Louisiana, Department of Social Services. He was subsequently adjudicated a child in need of care. Removal was necessitated by T.S.’s abusive behavior toward M.A.S. The child, who was not yet two years of age, had adult size bite marks on his face and left forearm. T.S. admitted that she bit M.A.S. on his face after he had bitten her. At the time of M.A.S.’s removal from parental custody, T.S. was separated from W.S., her husband and the father of M.A.S. W.S. was living with his stepfather, a convicted child molester, who had previously molested W.S. when W.S. was a child.
At the first family team conference on July 12, 2001, the participants developed a case plan for reunification of M.A.S. with T.S., who was expecting another child. The case plan set forth seven goals for T.S. to meet and the actions she must take to achieve these goals. The stated goals required T.S. to provide a safe and stable home for M.A.S. She was to be a nurturing and responsible parent able to meet the physical, medical, and | ^emotional needs of M.A.S. T.S. was required to cooperate with the agency (Office of Community Services) in assessing her parental needs and in following recommendations. She was to fulfill her legal responsibilities toward M.A.S. and to provide financial support for M.A.S. She was also to cooperate with the agency in making a permanent plan for M.A.S. Finally, she was to establish the paternity of her unborn child and seek prenatal care.
In meeting the seven goals, the case plan required T.S. to satisfactorily complete parenting and anger management classes. She was to undergo a psychological evaluation and successfully follow the recommendations of the evaluation. The plan also required her to establish and maintain a home kept clean and free from hazards. Among other actions, she was also required to interact in positive ways with M.A.S., treat him in an age appropriate manner, provide monthly financial support as well as gifts for M.A.S., and show her understanding of why M.A.S. was *819 placed in the custody of the State. The plan was approved by the court.
By the second family team conference on December 18, 2001, T.S. and W.S. had reconciled and were living together in a mobile home along with W.S.’s step-father. T.S. and W.S. had completed their psychological evaluations and had attended anger management classes. However, there was concern about the chaotic lifestyle of the couple and the lack of a good support system to assist them with parenting and maintaining a home. Notably, there was also concern about them allowing a convicted child | ¡¡molester to live in their home and their failure to understand how this could compromise the safety of a child living with them.
T.S. gave birth to R.S. on February 24, 2002. R.S. was placed in the custody of the State pursuant to an instanter order issued May 31, 2002, on the basis of validated allegations of sexual molestation by W.S. and his step-father involving two minor children of a family with whom W.S. and T.S. had lived at times. R.S. was subsequently adjudicated a child in need of care. A case plan for services with the goal of family reunification was developed and approved by the court.
Records from the family team conference of June 25, 2002, show that T.S. had been hospitalized for depression. Family reunification.remained the goal for M.A.S. and R.S. until the next family team conference on November 19, 2003. T.S. was then separated from W.S. and living with a man, B.C.C., against whom there had been validated allegations of sexual molestation of a child. Despite being advised of the risk of harm to children posed by B.C.C. and the fact that there could be no recommendation for return of the children under such circumstances, T.S. believed B.C.C. to be innocent and not harmful to children. Records also show that T.S. was having difficulty in redirecting M.A.S. during visits when he would become aggressive toward her and not follow instructions. Based on T.S.’s lack of progress toward satisfaction of the case plan goals, the State decided to pursue termination of parental rights with the permanent goal being adoption for M.A.S. and R.S.
|4On June 16, 2003, the State filed the petition for termination of parental rights, and the hearing took place on August 5, 2003. Laura Bounds, a case manager with the Office of Community Services, testified on behalf of the State regarding the agency’s involvement with the family and T.S.’s progress toward her case plan goals. Bounds testified that even though T.S. attended all the family team conferences and took part in the services offered, she did not show improvement in her ability to parent or protect the children from abuse. For instance, T.S. underwent the psychological evaluation as set forth in the plan and “somewhat” followed the recommendations from the evaluation, but she did not show substantial improvement in her mental health condition. As recently as July 2003, T.S. had been hospitalized after she threatened to kill herself or her boyfriend’s sister. The evaluation placed T.S. in the mild mental retardation range. Poor parenting skills and a limited understanding of child development were two problems noted in the evaluation, which concluded that T.S. was at a high risk to repeat abuse of her children. Even with the provision of services to address her needs, the prognosis for a positive outcome was guarded due to T.S.’s limited intellectual functioning and the severity of her personality and emotional disturbances.[1]
*820 Bounds noted that although T.S. attended parenting classes, she did not demonstrate that she had learned anything from the classes during the visits with the children. Bounds described T.S. as being “immature” in her dealings with the children. T.S. called them by different names and did not ^interact much with them. T.S. also had problems redirecting M.A.S., who was defiant with her. Bounds also testified that T.S. did not benefit from the anger management classes as she continues to lose her temper and make threats of violence, as mentioned above. Of most concern was T.S.’s continuing relationship with B.C.C., even though she was made aware that this relationship would jeopardize her relationship with her children.
The State also presented the testimony of Angela Ledford, who directed T.S.’s parenting classes. Ledford testified that T.S. did not learn anything from the classes. She described T.S. as being passive and noted that T.S. gave inappropriate responses in class. For instance, she referred to M.A.S. and her unborn child as “brats.” Ledford believed it was “very questionable” as to whether T.S. could parent her children and suggested that the situation would have to be “very closely monitored” if the children were returned to T.S.’s care.
T.S. testified on her own behalf. She stated that she still lived with B.C.C. T.S. explained that she did not take her caseworker’s advice to leave his residence because she “thought she was not telling me the right thing to do.”
At the close of evidence, the judge found that there had been no substantial compliance with the case plan by either parent and that there was no reasonable expectation of substantial improvement in either parent’s condition. Considering the children’s ages and need for a safe, stable, and permanent home, the court determined termination to be appropriate. | ^Judgment terminating the parental rights of T.S. and W.S. was signed August 21, 2003. This appeal by T.S. followed.
DISCUSSION
In a proceeding to terminate parental rights, the burden is on the State to prove all the elements of its case by clear and convincing evidence. La. Ch. C. art. 1035(A); State in the Interest of T.D., T.D., and W.D. v. R.D. and L.D., 34,580 (La.App.2d Cir.3/2/01), 781 So.2d 871. The grounds for termination are set forth in La. Ch. C. art. 1015, in relevant part, as follows:
(5) Unless sooner permitted by the court, at least one year has lapsed since a child was removed from the parent’s custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent’s condition or conduct in the near future, considering the child’s age and his need for a safe, stable, and permanent home.
Even when the State meets its evidentiary burden, a court should not terminate parental rights unless termination is found to be in the child’s best interest. State in the Interest of J.M., J.P.M., and M.M., 2002-2089 (La.1/28/03), 837 So.2d 1247.
The issues of parental compliance with a case plan, the parent’s expected success of rehabilitation, and the expectation of significant improvement in the parent’s condition and conduct are questions of fact in a termination proceeding. State in the Interest of A.R.H. and A.A.H. v. Hines, 35,800 (La.App.2d Cir.2/27/02), 810 So.2d 1166. The manifest error stan *821 dard of review applies to a trial court’s findings as to whether parental |7rights should be terminated. State in the Interest of K.G. and T.G., 2002-2886, 2002-2892 (La.3/18/03), 841 So.2d 759.
On appeal, T.S. argues only that the State failed to prove by clear and convincing evidence that there exists no reasonable expectation of reformation in the near future for her. T.S. contends that she has been trying to comply with her case plan and has shown some improvement. She asserts that while all her problems have not been eliminated, the facts do not justify termination.
La. Ch. C. art. 1036 governs proof of parental misconduct in termination proceedings. The relevant part, La. Ch. C. art. 1036(D) provides as follows:
D. Under Article 1015(5), lack of any reasonable expectation of significant improvement in the parent’s conduct in the near future may be evidenced by one or more of the following:
(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.
(2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.
(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.
In State in the Interest of S.M., 98-0922 (La.10/20/98), 719 So.2d 445, 450, the Louisiana Supreme Court addressed the concept of parental reformation with approval in the following passage:
Prior to August 15, 1997, there was no statutory guidance in | ¡¡determining whether the parent had shown “reformation” sufficient to preserve family reunification as a viable option to termination of parental rights. However, after reviewing the jurisprudence, we established the test in State in Interest of L.L.Z. that “a reasonable expectation of reformation is found to exist if the parent has cooperated with state officials and has shown improvement, although all of the problems that exist have not been eliminated.” State in Interest of L.L.Z. v. M.Y.S., 620 So.2d 1309 at 1317 (La.1993) (emphasis added.) Utilizing our statement in State in Interest of L.L.Z. as a springboard for elaboration, several appellate courts have held that “reformation” means more than mere cooperation with agency authorities. More importantly, reformation of the parent is shown by a “significant substantial indication of reformation ... such as altering or modifying in a significant way the behavior which served as a basis for the state’s removal of a child from the home.”
[[Image here]]
Furthermore, the jurisprudence has held that “[a] parent who professes an intention to exercise his or her parental rights and responsibilities must take some action in furtherance of the intention to avoid having those rights terminated.”
(Footnotes and citations omitted).
With these concepts of parental reformation and the statutory guidance in mind, our review of the record reveals no manifest error in the trial court’s finding of no *822 reasonable expectation of significant improvement in T.S.’s condition in the near future. T.S. lost custody of M.A.S. due to her abusive behavior toward him and her poor parenting skills. She lost custody of R.S. because of validated allegations of child molestation against W.S. and his step-father, who was residing with T.S. and W.S. The record shows that T.S. was provided with a variety of services by the state for the purposes of achieving family reunification. The record further shows that while T.S. took part in the services offered, she did not benefit from them to the extent of showing any appreciable improvement in her condition and in her ability to parent two small children.
| ¡Although T.S. attended anger management classes and obtained some counseling, she continues to exhibit some anger and violent tendencies associated with her mental health condition as testified to by the OCS caseworker, Laura Bounds. T.S. also attended parenting classes, but she has not demonstrated improvement in her parenting skills during the scheduled visits with her children. Of gravest concern is that at the time of the hearing, T.S. was continuing to live with her boyfriend, a known child molester, despite having been warned that doing so would jeopardize her ability to regain custody of her children. It is T.S.’s failure to appreciate the danger posed to the safety of her children by her association with a known child molester and her unwillingness to take steps to end the relationship and find another place to live that most clearly establishes the lack of any reasonable expectation of significant improvement in her conduct in the near future. T.S.’s conduct, particularly her pattern of association with sexual predators and her failure to benefit from the services offered, reasonably indicates that she is unable or unwilling to provide an adequate permanent home for her children.
While we recognize that T.S., despite limited intelligence and resources, did attempt to comply with her case plan, we are compelled to conclude that her efforts fell short of success. The trial court was correct in finding that the State met its burden of proof and that termination was in the best interests of the children, M.A.S. and R.S. In instances where the State succeeds in proving the grounds for termination and where the best interest | inof the child is served, the drastic step of termination of parental rights is appropriate. This is such an instance.
CONCLUSION
In accordance with the foregoing reasons, we affirm the Judgment of Termination of Parental Rights. No costs assessed as per La. Ch. C. art. 406(A).
AFFIRMED.

. The evaluation by Daniel J. Lonowski, Ph.D, P.C., was introduced into evidence. Dr. Lo-nowski did not testify.