# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 08-154

## STATE IN THE INTEREST OF S.D.G.

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 20030738
HONORABLE THOMAS R. DUPLANTIER, DISTRICT JUDGE

**********

## ULYSSES GENE THIBODEAUX
## CHIEF JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, John D. Saunders, and Marc T. Amy, Judges.

**REVERSED AND REMANDED.**

Lloyd Dangerfield
703 East University Avenue
Lafayette, LA 70503
Telephone: (337) 232-7041
COUNSEL FOR:
    Appellee - C.T.

L. Antoinette Beard
825 Kaliste Saloom Road
Brandywine I, Room 218
Lafayette, LA 70508
Telephone: (337) 262-1555
COUNSEL FOR:
    Appellee - State of La. Dept. of Social Serv., Off. of Comm. Services

Vivian Veron Neumann
730 Jefferson Street
Lafayette, LA 70501
Telephone: (337) 232-5170
COUNSEL FOR:
    Appellee - S.D.G.

**Allyson M. Prejean**
**P. O. Box 3862**
**Lafayette, LA 70502-3862**
**Telephone:  (337) 291-9444**
**COUNSEL FOR:**
      **Appellant - D.G.**

**Michelle Breaux**
**Assistant District Attorney - 15th Judicial District Court**
**P. O. Box 3306**
**Lafayette, LA 70502**
**Telephone:  (337) 232-5170**
**COUNSEL FOR:**
      **Appellee - State of Louisiana**

**Mitzi Duhon**
**1319 West Pinhook Road**
**Lafayette, LA 70508**
**COUNSEL FOR:**
      **Appellee - Casa of Acadiana Association**

**THIBODEAUX, Chief Judge.**

D.G. appeals the judgment that terminated her parental rights to her daughter, as petitioned for by the Louisiana Department of Social Services, Office of Community Services (DSS). D.G. argues that DSS failed to prove by clear and convincing evidence that she satisfied the grounds for termination as set forth in La.Ch.Code art. 1015(5). We agree and find the judgment of the trial court to be manifestly erroneous. Accordingly, the judgment of the trial court is reversed and this case is remanded to the trial court for further proceedings consistent with this opinion.

I.

## ISSUE

Did DSS establish by clear and convincing evidence that D.G. failed to "substantially comply" with her case plan and that there was no "reasonable expectation of significant improvement" in D.G.'s condition and/or conduct in the near future, as required by La.Ch.Code art. 1015(5)?

II.

## FACTUAL AND PROCEDURAL BACKGROUND

The child at issue, S.D.G., was removed from her mother's custody by DSS in October of 2003 at the age of three months, after a report of child neglect due to drug dependency was validated by DSS. DSS' investigation of the mother had been instituted a few months earlier in July of 2003. At that time, D.G. was the domiciliary parent of her two other minor children and was in the last days of her pregnancy with S.D.G. D.G., who was twenty-nine years old at the time, was unmarried to the father of her three children, although she and the father, C.T., had

maintained a decade-long relationship. D.G. is deaf and almost completely mute[1]. She receives SSI disability benefits because of her hearing impairment. She has some college education.

The investigation determined that D.G. had been using cocaine and marijuana during her pregnancy. DSS also established that she was homeless. The two children were placed with their father, C.T.[2] Through DSS's Family Services Program, D.G. was required to seek adequate housing and was required to participate in substance abuse treatment. No action was taken by the agency regarding unborn S.D.G. at the time.

S.D.G. was born on July 31, 2003, and there were no drugs detected in her system at the time of her birth. The child remained in her mother's care as DSS monitored and attempted to provide services to them. Nevertheless, during the next few months, D.G. failed to cooperate with the program's requirements for drug treatment and screening or to obtain her own permanent housing, although assistance was being offered to her in this regard. In October, she tested positive for cocaine use. Consequently, DSS obtained an Instanter Order from the trial court, gaining temporary custody of S.D.G. S.D.G. has remained in DSS's custody, and has resided with and remained in the care of one foster family since that time.

S.D.G. was four years old at the time of the parental termination hearing and in good health. She was developmentally-delayed in speech and motor skills as a toddler, but by the age of three had made significant improvements in "catching up"

---

[1]Communications between D.G. and DSS case workers consisted mostly of the exchange of writings. The record reflects that DSS provided interpreters at case review meetings and at court appearances; however, D.G. disputes whether all interpreters were certified as required and made available to her in all necessary instances. No ruling was made by the trial court on this issue by the trial court and this issue was not preserved for appellate review.

[2]C.T. and D.G. were not married or living together. C.T. is also the father of S.D.G. C.T. acquiesced in the termination of his parental rights to S.D.G. and has not appealed the trial court's judgment.

with her peer group, according to DSS. S.D.G.'s maternal family line contains genetic hearing loss (D.G., D.G.'s brother, and D.G.'s son), and S.D.G. was diagnosed with auditory neuropathy, a condition which causes inconsistent levels of hearing loss throughout the day. Consequently, S.D.G. wears a hearing aid, is learning sign language and other communication skills, and is placed in a public program with other children of similar needs. As of trial time, she was thriving in her classroom environment.

In November 2003, the first Family Case Plan was developed. It required the mother, D.G., to participate in further substance abuse evaluations and treatment; participate in a required mental health assessment and any subsequent recommended treatments; obtain safe and stable housing; demonstrate the ability to provide for the care and needs of her children[3]; and maintain her parental bond with S.D.G. by participating in regularly scheduled visitation. She was also assessed a monthly parental contribution in the amount of $25.00. The Child's Case Plan set forth a permanent plan goal to reunify S.D.G. with her parents. The deadline for meeting this goal was April 2004.

The goals were not achieved by the April 2004 deadline. According to the testimony of Nichelle Milburn Frank, the case worker assigned to this family during that period, the primary concern continued to be D.G.'s drug use. Although D.G. had enrolled in the Lafayette Addictive Disorders Clinic's (LADC) programs, she missed and rescheduled some appointments and tested positive for drug use during random screenings in November 2003, January 2004, February 2004, and March 2004.

---

[3]Although the initial case plan references "children," this appeal involves only D.G.'s case plan compliance as it applies to S.D.G.

Ms. Frank, however, testified that D.G. complied with some aspects of the plan during that initial case plan period. She testified that D.G. succeeded in obtaining her own housing, although DSS deemed it inadequate. This is because the home being rented by D.G. was a two-bedroom house, and she lived there with her brother, his girlfriend, and their infant child. DSS concluded there was not adequate space for S.D.G. under these circumstances. D.G. also failed to provide verification of paid monthly expenses as requested by DSS. Notwithstanding this, according to Ms. Frank, D.G. complied with the majority of the visitation schedule, although she missed three of the twenty-five scheduled visits with S.D.G. and was late for two visits.

Regarding D.G.'s mental fitness at the time of S.D.G.'s removal from her custody, the record reflects that D.G. participated in—as was required by the case plan—an initial psychological evaluation with psychologist, Ed Bergeron, Ph.D., in December of 2003. Notably, at that visit, D.G. admitted to having a cocaine addiction and acknowledged this as the reason for her loss of custody of her children. Dr. Bergeron's diagnostic tests revealed an "average" IQ. His concluding diagnostic impression was that D.G. suffered from a generalized anxiety disorder, cocaine dependence, and a personality disorder with poor coping skills, i.e., her mood was dysphoric, she had low self-esteem, and suffered from self-doubt. Dr. Bergeron recommended against reunification of S.D.G. and D.G. at the time, advising that D.G. needed to be able to exhibit a pattern of stability before S.D.G. was returned. Moreover, he advised that D.G. needed to be provided, and required to participate in, additional substance abuse treatment, mental health services and/or medication, and parenting training.

As a result, S.D.G. remained in her current foster placement and a second case plan was timely approved approximately six months later in April 2004. Reunification with the parents was still the goal. According to the case worker, Ms. Frank, DSS's main concern during the period of the second case plan continued to be drug usage. Because of D.G.'s recent positive drug test results and her failure to comply with the LADC outpatient program's twice-weekly meeting requirements, D.G. was referred to the LADC inpatient substance abuse treatment program at the Pines facility in Shreveport, Louisiana. D.G. attended from July 1-29, 2004, but soon after her release, she relapsed and again failed to remain drug free. Specifically, DSS reported that D.G. admitted to having used cocaine on or about August 21, 2004, as well as to obtaining and using the narcotic, Lortab. In its October 7, 2004, report to the trial court, the DSS case worker reported that this prescription drug usage indicated that D.G. still "d[id] not fully understand the nature of [her] addiction and the need for constant vigilance to remain drug free." Moreover, as of September 2004, D.G. was consistently missing her weekly aftercare service appointments with the LADC.

Consequently, the third family case plan, approved by the trial court in October 2004, set forth a new permanent placement plan goal of adoption. DSS asserted that change of the goal from reunification to "Termination of Parental Rights/Adoption," as to both parents, was necessary because S.D.G. had been in DSS custody for over one year and there was a need to establish permanency for her.

D.G. was still required to work towards acquiring and maintaining a drug-free lifestyle that would enable her to responsibly care for S.D.G. The subsequent case plans required that D.G. achieve this goal by complying with the LADC substance abuse treatment and screenings, and "avoid[ing] the use of all

5

prescribed or over the counter medications that can be habit forming and . . . be[ing] honest with any treating physician about her addiction, and history of substance abuse." Secondly, the case plan required D.G. to follow through with the recommendations of her psychological evaluation, which included participating in counseling and/or medicinal therapeutic services.

She was also required to maintain "safe and stable" housing and to "demonstrate her ability to care for her children and effectively meet their needs." According to the case plan, this meant that D.G. was to independently maintain a home environment that is "free and safe from violence, drugs or unsafe persons." D.G. was directed in the plan to "not have any one with violence and/or substance abuse issues residing in or visiting the home." She was also ordered to refrain from contact with known substance abusers, and was to give her case worker verification of her paid monthly expenses.

Finally, D.G. was ordered to maintain her parental bond with S.D.G. through visitation and appropriate interaction and to continue to assist DSS in achieving a permanent plan for S.D.G. D.G. was to do so by keeping DSS informed of all of her pertinent life changes, providing names of suitable relatives for the possible placement of S.D.G., providing consent forms for the release of information from her landlord and service providers, providing DSS with verification of her receipt of SSI benefits, and cooperating with services to be provided to S.D.G. by the DEAF Action Center, Village du Lac, and LADC.

For the following three years, from October 2004 – October 2007, these goals and action plans remained unchanged. The assigned DSS case worker from October 2004 – September 2006 was Angela Broussard. In late 2004 and early 2005, Ms. Broussard expressed concern that there was excessive and/or abusive use of

6

cocaine and Lortab by D.G. D.G. tested positive for cocaine use in November 2004, January 2005, and February 2005[4] and her aftercare treatment with LADC was inconsistent over these months. Additionally, Ms. Broussard contends that even though D.G. had been counseled against the use of any drugs after her completion of inpatient treatment, she obtained multiple prescriptions for Lortab for a myriad of physical complaints, including an injured toe, migraine headaches, back injury, and an ovarian cyst, which signaled likely abusive use of the medication. In January 2005, LADC considered D.G.'s use of Lortab as noncompliance with treatment and advised her that she could not continue treatment if she continued use of the Lortab. D.G. commenced regular and consistent involvement in LADC's Aftercare Program shortly thereafter, in April 2005.

On July 18, 2005, DSS moved forward with the filing of a Petition for Termination of Parental Rights and Certification for Adoption as to both parents, pursuant to the provisions of La.Ch.Code art. 1015(4)(b)[5] and (5). In the meantime, case plans continued to be established and worked by D.G. and a second psychological evaluation of D.G. was performed by Dr. Bergeron. Notably, during this time, Dr. Bergeron reported the results of his April 2005 evaluation of D.G. He re-administered the Personality Assessment Inventory, which he found "remarkable" because it was severely elevated on the drug abuse scale, although D.G. denied that she was using drugs, and there had been no positive drug test results since February 2005. He concluded that, at the very least, D.G. was at a "very high risk" of relapsing. She also was significantly elevated on the stress/anxiety scale. Dr.

---

[4]D.G. filed a police report in March 2005, claiming that C.T. had come to her home and attempted to rape her and that he forced her to use cocaine on that occasion. No evidence of the outcome of this complaint was provided in the record.

[5]This ground, alleging termination for failure to contribute to the support to the child, was abandoned at the hearing.

Bergeron, again, did not recommend reunification, stating that D.G. needed medication for her stress/anxiety, needed to exhibit a strong support system to prevent a relapse, and needed to obtain six months, completely drug free.

Despite D.G.'s apparent struggles in the early months of 2005, DSS recorded in its reports and testified through its case workers that D.G. began to make improvements and achieved more compliance with the case plans later in 2005 and throughout 2006. DSS and CASA workers observed that D.G. had visited with S.D.G. for twelve months, from February 2005 to February 2006, without absence, for their allotted twice-monthly visitations and that she often included S.D.G.'s two siblings. They also reported that in February 2006, D.G. had gained brief employment at the Holiday Inn, but she resigned to do independent housekeeping work. She continued to receive SSI disability and was able to verify payment of monthly rent and utilities with her case worker during that time.

In early 2006, D.G. had maintained continuous housing in her two-bedroom home for two years. Her brother continued to live there with her, as well as his girlfriend, child, and D.G.'s other two children. The children, ages twelve and thirteen, had been returned to her care by their father, C.T. in June 2005, although he maintained legal custody. The two children were sleeping in bunk beds in the middle room of the house, formerly the dining room; a toddler bed was in place there for S.D.G. as well. DSS took no action to remove the children from D.G.'s care. According to Ms. Broussard, despite the limited bedroom space available, D.G. had provided adequate care and parenting to the two older children for the eight months they had been there.

Additionally, as of early 2006, D.G. had remained drug free since February 2005, as confirmed by random drug testing being performed by LADC,

where she still regularly attended weekly aftercare sessions. According to case worker, Angela Broussard, the September 2005 trial on DSS's petition to terminate parental rights was ultimately continued twice upon the motion of DSS, "due to the significant compliance from Ms. Guidry" over a period of ten months, December 2005 - September 2006.

In DSS' February 2006 status report to the trial court, Ms. Broussard wrote that "with the significant progress made by [D.G.] on her case plan, and the need to reconsider termination of [D.G.'s] parental rights," visits were moved back to the OCS office (from McDonald's playground) so that D.G. and S.D.G. could be more closely observed in a structured setting without distractions. The foster care worker noted that S.D.G. was a "very shy, reserved child, and very attached to her foster mother," and that, essentially, efforts needed to be made to assist her in bonding with D.G.

Consequently, supervised outings and more lengthy visitations between S.D.G. and D.G. were allowed. DSS reported to the trial court through Ms. Broussard that there had been success with a recent visit to a photography studio by S.D.G., her siblings, and D.G., during which S.D.G. was relaxed and comfortable for the two hours she was alone with her mother and siblings. The apparent progress being made during these visits, consequently, led to DSS' recommendation for a referral of S.D.G. to Early Childhood Supports and Services (ECSS) to assist her and D.G. in improving and solidifying their parent-child bond. The therapy included the foster mother to assist with S.D.G.'s bonding and transition from the foster family to D.G.'s home.

Despite the apparent optimism presented by DSS during the dispositional review hearing and in the subsequent report issued to the trial court in February 2006, the next case plan report submitted to the trial court by DSS in May 2006 was less

optimistic and requested that the parental rights termination hearing be placed on the court's docket for resolution. DSS wrote in its report to the trial court that "[D.G.'s] case plan goal of 'participating in permanency planning for [S.D.G.]' had not been met" because D.G. failed to inform the case worker that she was expecting her fourth child. Ms. Broussard discovered the pregnancy in April of 2006, shortly before D.G. gave birth later that month. She believed the additional child posed considerable problems for S.D.G.'s return.

Ms. Broussard contended that D.G. failed to "maintain a safe and stable housing adequate for her family" and that she failed to "demonstrate her ability to provide care for her children and effectively meet their needs." In support of this assertion, Ms. Broussard stated that she observed inadequate sleeping arrangements for the infant child, noting that there was not a proper crib set up, but that the child was sleeping in a king-sized bed with D.G. In addition, Ms. Broussard reiterated concern that the two bed-room home was not of an adequate size for D.G. and the children. According to Ms. Broussard, D.G.'s brother had "only recently moved out of the home" in April, after repeated unsuccessful requests had been made over the past few years that he and his family move out to ensure adequate space for D.G.'s children in the home.

Once D.G.'s brother moved out, D.G.'s oldest daughter occupied the second bedroom, which she would share with S.D.G. D.G. had purchased a toddler bed and dresser for S.D.G., which were located in the sister's bedroom. D.G.'s son was attending the Louisiana School for the Deaf in Baton Rouge at the time and was not regularly at the home. Ms. Broussard expressed DSS' continued concern with the size of the home, however, speculating that D.G.'s boyfriend, D.T., and his son had moved in. DSS later confirmed, however, that D.T., who is also deaf and is the father

of D.G.'s youngest child, lived and worked in Baton Rouge, but was at D.G.'s home every weekend to be with D.G. and his daughter. He often brought along his son for the visits. After the child's birth, DSS was informed that D.G. and D.T. intended to marry and relocate to Baton Rouge, but were awaiting the resolution of the placement of S.D.G.

The birth of the fourth child in early 2006 led the DSS case worker to become increasingly concerned with D.G.'s purported ability to provide care for her children and effectively meet their needs. Case worker Broussard expressed to the court DSS's concerns about D.G.'s failure to work since the birth of her youngest child and her possibly limited ability to pay her rent and utilities as needed. In this regard, and despite contrary claims by D.G. and D.T. that he had taken responsibility for financially providing D.G. with her living expenses, Ms. Broussard noted only that D.G.'s telephone had been disconnected "on more than one occasion," questioning the consistency and amount of financial support being provided. She, however, noted in her May 2006 report to the court, as she did in the February 2006 report, that she had observed D.G. provide adequate care to the children that were in her care. She also noted that the family received food stamps and that adequate food was available in the home. Cleanliness of the home was not an issue. Nevertheless, she reiterated the agency's concern for the safety of the two youngest children, stating: "[t]he agency is very concerned about how [D.G.] will meet S.D.G.'s needs if she is returned to her care, especially as a speech/language delayed child returning to the care of a non-hearing parent with a new baby."

A new case worker, Jenee Broussard, was assigned to the family from November 2006 to July 2007. The case plans remained unchanged and the permanent placement goal continued to be adoption, although efforts at reunification continued.

11

In January of 2007, after a DSS Regional Level Staffing review, the decision was made to further continue reunification efforts. Particularly, more frequent visits were initiated and family therapy was commenced with social worker, Christine Dugas.

Extended visitation with S.D.G. in D.G.'s home each weekend began that summer as well, under DSS's direction. D.G. picked up S.D.G. on Thursdays at 11:45 a.m. from her summer program, and S.D.G. spent Thursday night through Monday afternoon with D.G. She spent Monday night through Wednesday night with the foster family.

Ms. Dugas had positive reactions to the progress made. In July 2007, joint therapy, followed by a period of individual therapy with D.G. only, had been "productive." In May of 2007 when the joint therapy resumed after a month of individual therapy, Ms. Dugas acknowledged receiving reports that S.D.G. had begun to exhibit some day and night-time wetting, behavioral problems at school, loss of appetite, and had induced vomiting on at least one occasion, which was all likely related to the extended visitation that had commenced with D.G. and the separation from her foster family. However, Ms. Dugas reported that the behaviors subsided as she worked with S.D.G. Ms. Dugas reported a resolution of these issues as also being related to S.D.G.'s attendance at a summer sign language program at a local public school. Ms. Dugas said the class allowed her to be able to communicate her wants and needs more effectively for the first time. S.D.G. was also able to communicate more effectively with D.G. as a result. As was made clear by Ms. Dugas and CASA workers, however, the custody issue was in need of resolution due to the emotional strain it was clearly causing the three-year-old child. The foster parents were distressed as well, Ms. Dugas wrote in her report, about the possible change in custody and were seeking to adopt S.D.G., to whom they were very attached.

Jenee Broussard oversaw the family visitations. She stated initial disapproval in the level of interaction between S.D.G. and D.G., stating that on one occasion, D.G. had to be "coaxed" to play with S.D.G. She also testified to an incident during which S.D.G., her toddler sister, and the other children were present and D.G. was unaware of the fact that the younger child had become stuck between the sofa and playpen. D.G. had been engaged with the caseworker and other children at the time.

Ms. Broussard testified that she perceived a lack of sufficient involvement on the part of D.G. She explained that she received a report that D.G. had failed to assist the foster mother in restraining S.D.G. during a hearing screening, when the child had a negative reaction to a medication she had been given and began to act uncontrollably. The foster mom and nurse advised that D.G. left the room to get something to eat and returned later. D.G. testified that there was a misunderstanding because an interpreter was not present, and she thought she was told that she was not needed. Of concern to DSS was also S.D.G.'s possession at school of an unopened Nyquil packet of medication. There was no explanation provided in the record of how, or why, the child was in possession of the medication. There was also a complaint made by the foster mother that D.G. did not make S.D.G. wear her hearing aids while in her care. D.G. denied this, stating that this occurred on an occasion when the hearing aids were not working properly and needed repair.

During this time, however, Ms. Dugas noted progress and a "dramatic change" for the better in S.D.G.'s overall demeanor as the sessions continued. S.D.G. was now being allowed to transition for a few hours with D.G. before sessions, and she arrived at the therapy sessions "happy, relaxed, playful and responsive to [D.G.]" They were now more able to communicate using sign language according to Ms.

13

Dugas, as well. Additionally, in July 2007, Ms. Dugas reported that D.G. had gained greater insight and acceptance into the impact of lengthy separations on S.D.G. and was seeking to strengthen the bond between she and S.D.G. Ms. Dugas noted that S.D.G. referred to D.G. as "momma" and willingly allowed her to comfort and hold her.

On July 7, 2007, the extended visitation was terminated when DSS removed S.D.G. from D.G.'s home after a report was received that C.T. was at the home, in violation of the case plan orders, prohibiting "unsafe persons" from being there. S.D.G. was asleep in a bedroom while he was there by all accounts. DSS also received a report from the foster mom that C.T. had been at the home on July 2, 2007, as well. D.G. testified that she was not informed that C.T. could not come to the home to visit his other children who lived there and were also present on that occasion. She testified that she did not consider him to be a threat.

Megan Callais, the case worker assigned to the case for the two months preceding the termination hearing, testified that monthly visitation between S.D.G. and D.G. was continuing. She stated that S.D.G. was usually hesitant at the beginning of the visits, but soon "warms up." Ms. Callais testified that she observed appropriate behavior and interaction from both D.G. and S.D.G. She also testified that D.G. moved to Baton Rouge, Louisiana in September 2007, and was living in a three-bedroom home with D.T. and her other children. Ms. Callais stated that she had not visited the home to evaluate the living circumstances.

The trial court granted the termination of S.D.G.'s parental rights. In its Reasons for Judgment, the trial court reasoned that the grounds to satisfy La.Ch.Code art. 1015(5) were met by DSS's presentation of evidence. The trial court wrote in its Reasons for Judgment that "[t]his [c]ourt's main concern with [D.G.] regaining

custody of [S.D.G.] is her lack of parenting skills and inability to care for a special needs child." The trial court wrote that DSS established that S.D.G. has auditory neuropathy, a condition that causes the child's hearing abilities to fluctuate throughout the day; however, when the child is in D.G.'s care, D.G. does not make her wear the hearing aids, which are designed to assist in preventing total hearing loss. The court further wrote that D.S.S. established that S.D.G. "acts out" at school when she is aware that D.G. will be picking her up after school, rather than the foster mom. Moreover, noted the court, the evidence presented established that S.D.G. has suffered "severe physical and emotional setbacks" during overnight visits with D.G., including not using her voice, day and night-time wetting, loss of appetite, and self-induced vomiting.

We find that the trial court manifestly erred in concluding that DSS proved by "clear and convincing evidence" the grounds of La.Ch.Code 1015(5).

III.

**LAW AND ANALYSIS**

**Involuntary Termination Pursuant to
Louisiana Children's Code Article 1015(5)**

The supreme court has stated the following regarding proceedings to involuntarily terminate parental rights:

> Title X of the Children's Code governs the involuntary termination of parental rights. To assist the court in determining whether a parent is unwilling or unable to adequately care for a child's physical, emotional, and mental health needs, La.Ch.Code art. 1015 provides the specific grounds for involuntary termination of parental rights. The State must only establish one ground under La.Ch.Code art. 1015, but the judge must also find that the termination is in the best interest of the child. La.Ch.Code art. 1039. Additionally, the State must prove the elements of one of the enumerated grounds by clear and convincing evidence to sever the parental bond. La.Ch.Code art.

15

1035(A); *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (holding that the minimum standard of proof in termination of parental rights cases is clear and convincing evidence).

*State ex rel. C.J.K.*, 00-2375, p. 8 (La. 11/28/00), 774 So.2d 107, 113.

In this case, DSS asserts that it satisfied the grounds for termination pursuant to Louisiana Children's Code article 1015(5). That article states:

**Art. 1015.  Grounds**

The grounds for termination of parental rights are:

. . . .

(5) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

As is set forth in La.Ch.Code art. 1036(C), a finding of a lack of parental "substantial compliance" with the required case plan may be made by establishing the following acts or omissions of the parent:

**Art. 1036.  Proof of parental misconduct**

. . . .

C.    Under Article 1015(5), lack of parental compliance with a case plan may be evidenced by one or more of the following:

(1) The parent's failure to attend court-approved scheduled visitations with the child.

(2) The parent's failure to communicate with the child.

16

(3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.

(4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.

(5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.

(6) The parent's lack of substantial improvement in redressing the problems preventing reunification.

(7) The persistence of conditions that led to removal or similar potentially harmful conditions.

The "lack of reasonable expectation of significant improvement" component of Article 1015(5), is established by satisfying one or more of the components of La.Ch.Code art. 1036(D), which states:

D.    Under Article 1015(5), *lack of any reasonable expectation of significant improvement in the parent's conduct in the near future* may be evidenced by one or more of the following:

(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.

(2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.

(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.

(Emphasis added).

17

DSS argued at trial that S.D.G. failed to substantially comply with the case plan for services because of (1) drug abuse: the lack of resolution of her drug abuse issues evidenced by S.D.G.'s use of hydrocodone after the birth of her youngest child in 2005; (2) housing: S.D.G.'s occupation of a two-bedroom home for the four years of the agency's involvement, in the case; (3) therapeutic services: D.G.'s unilateral discontinuation of the use of prescribed anti-anxiety and depression medication and S.D.G.'s continuing primary bond with her foster mother, despite several months of therapy to promote bonding with D.G.; and, (4) visitation: D.G.'s five-weeks of missed visits with S.D.G. after the birth of her youngest child; S.D.G.'s regressive behavior expressed in anticipation of and after extended home visits with D.G.; and, D.G.'s difficulties, as a deaf person, in caring for a toddler and infant child simultaneously.

The facts presented by DSS to the trial court in testimony and reports covering the four-year span of providing services to this family reveal marked improvement in, and apparent resolution of, the issues of drug abuse and homelessness that caused the loss of D.G.'s custody of S.D.G. in the first place. D.G. achieved sobriety in early 2005. She successfully completed Aftercare Therapy with LADC, and no evidence of a relapse was presented at the termination hearing. Although DSS reported concerns about a relapse because of D.G.'s apparent receipt of a prescription for hydrocodone from her dentist in 2005, nothing more was presented to the court to establish that this, or any other drug, had become an issue. To the contrary, DSS continued with reunification efforts and instituted extended, unsupervised visitations with S.D.G. in D.G.'s home. This court also notes that DSS observed D.G.'s full-time care of her three other children, at least from 2005 through

18

the trial, and DSS took no actions regarding their removal from the home due to any issues, including drug abuse.

It is undisputed that D.G. has maintained a home since 2004. DSS case workers reported that D.G. succeeded in making the second bedroom in the home available to S.D.G. and her older sister and that D.G. purchased a bed and a dresser for S.D.G. for the bedroom. The occupation of the second bedroom by D.G.'s brother, his girlfriend, and child, was the main concern with D.G.'s home situation; this issue was resolved.

After the birth of D.G.'s youngest child, the issue of D.G.'s hearing loss and her capacity to parent the two, young children became a dominant issue of concern for DSS. We note, however, that D.G.'s deafness was not the reason S.D.G. was removed from D.G.'s custody. Moreover, there was no expert opinion offered or pattern of established behavior presented to the trial court, regarding the effect of her hearing loss on the parenting of her children. *See* La.Ch.Code art. 1036(D)(3).

All extended visitation efforts and provision of counseling and therapy services to assist in transitioning S.D.G. to D.G.'s home, were abruptly ended as a result of C.T.'s presence in D.G.'s home in July 2007. Although DSS asserts that this constituted a violation of the court's order, substantiation of the allegations in DSS' reports to the court regarding C.T.'s alleged criminal and/or drug use history were not made a part of the record in these proceedings. Moreover, it was admitted by DSS at the hearing that they had not advised D.G. of how to handle C.T.'s visitation with his other children, who were living with D.G. as well. This court also finds that C.T.'s apparent continued access to and maintenance of legal custody to C.T. of the other two children, which was known by DSS, is irreconcilable with DSS's actions as to S.D.G.

Accordingly, this court finds that considering the evidence presented and the law governing involuntary termination proceedings, the trial court committed manifest error in determining that DSS established by *clear and convincing evidence* the grounds set forth in La.Ch.Code art. 1015(5). Namely, it was not established according to this standard that there had been no substantial compliance with the case plan by D.G. as necessary for the safe return of D.G., nor was it established that despite earlier intervention, there was no reasonable expectation of significant improvement in the near future, considering S.D.G.'s age and her need for a safe, stable, and permanent home.

Regarding whether reformation in the near future can be reasonably expected, the supreme court has written:

> The jurisprudence indicates to us that there is no expectation of reformation and no likelihood of reformation when the parent exhibits prolonged and consistent abusive or negligent behavior or a long history of substance abuse. Furthermore, conduct such as mental or behavioral disorders which cause a parent to refuse to cooperate with the authorities in addressing the needs of the child would also suggest that no reasonable expectation of reformation exists and that it is unlikely that the parent will reform. However, a reasonable expectation of reformation is found to exist if the parent has cooperated with state officials and has shown improvement, although all of the problems that exist have not been eliminated.

*State in Interest of L.L.Z. v. M.Y.S.*, 620 So.2d 1309, 1317 (La.1993). Moreover, "[r]eformation sufficient to prevent termination of parental rights requires that the parent demonstrate substantial change, such as significantly altering or modifying the behavior that resulted in the State's removal of the child from the parent's home." *State in the Interest of D.T., L.T., and M.T.*, 29,796, p. 9 (La.App. 2 Cir. 6/18/97), 697 So.2d 665, 670. In this case, as recited herein, the facts do not reasonably support the conclusion that there is no reasonable expectation of significant improvement in the

near future. Accordingly, this matter is remanded to the trial court for reinstitution of Child in Need of Care proceedings, pursuant to La.Ch.Code art. 1039(B)(3).

## IV.

## **CONCLUSION**

The judgment of the trial court is manifestly erroneous and is reversed. We remand this matter to the trial court for further proceedings consistent with this opinion.

All costs are assessed to the Louisiana Department of Social Services.

**REVERSED AND REMANDED**.