52 So.3d 852 (2010)
STATE of Louisiana in the Interest of H.A.S. and C.W.C.
No. 2010-CJ-1529.
Supreme Court of Louisiana.
November 30, 2010.
Diane Elaine Cote, for Applicant.
Anderson & Dozier, Keith Paul Saltzman, Lafayette, Allyson Melancon Prejean; Vivian Vernon Neumann, Michael Harson, District Atty; The Dangerfield Law Firm, Lloyd Dangerfield, Christopher Luke Edwards, Lafayette, for Respondent.
VICTORY, J.[*]
We granted a writ in this termination of parental rights case to determine if the court of appeal erred in reversing a trial court judgment terminating the parental rights of the mother, "S.M.S.S." After reviewing the record and the applicable law, we find the trial court was premature in terminating S.M.S.S.'s parental rights and remand this matter to the trial court to reinstate the child in need of care proceeding pursuant to Title VI of the Children's Code.

FACTS AND PROCEDURAL HISTORY
S.M.S.S. is the biological mother of H.A.S., a girl born July 11, 2005, and C.W.C., a boy born April 17, 2000. The *853 father of H.A.S. is J.S., who is now deceased; the father of C.W.C. is C.C., who is presently incarcerated. In February 2007, the Louisiana Department of Social Services, Office of Community Services ("OCS") obtained custody of the children based upon allegations of neglect, sexual abuse, chronic and longstanding substance abuse, and allegations the mother might flee with the children.[1] On March 13, 2007, the children were adjudicated as children in need of care, and have remained in foster care since that time. A case plan was developed on March 14, 2007, with the goal of reunification with the parents, which included the following requirements for S.M.S.S.: (1) completion of parenting classes and weekly visitation with the children; (2) participation in a psychological evaluation and compliance with the recommendations of the psychologist regarding appropriate treatment; (3) successful completion of an inpatient substance abuse treatment program and maintenance of sobriety; (4) submission to random drug screens; (5) attendance of local Narcotics Anonymous meetings in her community twice a week; (6) attendance of Family Violence Intervention Program; (7) maintenance of a steady income; and (8) maintenance of adequate and stable housing.
In July 2008, the case plan's goal was changed to adoption for both of the children. H.A.S. was living with non-relative foster parents who would adopt her if she was freed for adoption, and C.W.C. was living with his paternal grandfather, a certified foster parent. On March 24, 2009, OCS filed a "Petition for Termination of Parental Rights and Certification for Adoption." Relying on La. Ch. C. art. 1015(5),[2] OCS asserted the mother's rights should be terminated because she had not substantially complied with her case plan and had no reasonable expectation of significant improvement of her condition or conduct in the near future. The matter was heard on August 31, September 1, and September 2, 2009.
Linda Lenoir, the OCS caseworker for the mother and children, testified that the case plan remained essentially the same throughout the time the children were in OCS's custody. Lenoir testified that S.M.S.S. was compliant with the case plan regarding housing, parenting classes, and *854 visitation with the children. She testified that S.M.S.S. had odd jobs as a carpenter, had a family support system in place and addressed her medical needs. The main issue that concerned OCS involved S.M.S.S.'s drug use and mental health care. Lenoir testified that although S.M.S.S. attended a 28-day in-house drug treatment program at Southeast Medical Hospital and attended an aftercare support group called Celebrate Recovery at her church, she refused to submit to psychological counseling in direct contravention of the case plan. Further, while she began seeing Dr. Susan Ulrich, a licensed psychiatrist, in November 2008, Dr. Ulrich provided only prescriptions and medical monitoring, not psychiatric counseling. Finally, Lenoir presented evidence that S.M.S.S. tested positive for drugs thirteen out of seventeen random drug screens, including testing positive for cocaine on numerous occasions.[3]
Dr. Ed Bergeron testified that he conducted a psychological evaluation of S.M.S.S. on April 20, 2007. He testified she suffered from post-traumatic stress disorder, bipolar disorder, cocaine dependence, dependent personality disorder and a maladaptive behavior disorder. In his view, she was inclined to act out her emotions, to become involved in unhealthy relationships, and had a strong inclination for addictive behaviors because mood-altering chemicals provided her with relief from emotional distress. Based on this evaluation, he testified he would not recommend reunification until she completed her treatment and established a pattern of stability. He has not seen her since that evaluation on April 20, 2007.
Dr. Ulrich testified S.M.S.S. was referred by her primary care physician, Dr. Nathan Landry. Dr. Landry asked that she evaluate and treat S.M.S.S. for any psychiatric illness. Dr. Ulrich first saw her on November 6, 2008, and diagnosed her with post-traumatic stress disorder,[4] obsessive-compulsive disorder, and partial complex-seizure disorder,[5] and has been seeing her consistently since that time. Dr. Ulrich prescribed Depakote, an anti-seizure medication for her partial complex seizure disorder, and Remeron and Cymbalta for her obsessive compulsive disorder. She testified that none of these medications contained narcotics or amphetamines because S.M.S.S. is an addict. Dr. Ulrich testified that she could not render an opinion as to whether S.M.S.S. could provide a safe and stable home, but relative to her post-traumatic stress disorder, obsessive compulsive disorder and seizure disorder, S.M.S.S. was medically sound and had engaged in her treatment. She further testified that she does not provide the mother psychological counseling services, but she would have noticed if S.M.S.S. were using cocaine. She did not see any signs of relapse or cocaine use *855 during her treatment. At no time did S.M.S.S. advise Dr. Ulrich that she had been prescribed, or was taking, any medications containing narcotics.
No other physicians testified, although voluminous medical records were introduced into evidence relative to S.M.S.S.'s medical history. Records from Lafayette General Medical Center indicate she visited its emergency room seventeen times from February 25, 1999, until March 31, 2009, for reasons ranging from physical injuries resulting from accidents or domestic abuse, to shoulder pain and disc problems. Two of her treating physicians, Dr. Landry and Dr. Bryan Frentz, an orthopaedist, apparently were employed by Hamilton Medical Group, where S.M.S.S.'s mother also was employed as a nurse. From the time S.M.S.S. began to work on her case plan until the time of trial, she visited Hamilton Medical Group twenty-two times for various reasons, some of which appear to be follow-up visits from emergency room visits. These records indicate the doctors were aware S.M.S.S. was a "recovering addict" and was taking various medications, including the drugs prescribed by Dr. Ulrich. On April 3, 2009, and June 29, 2009, Dr. Frentz prescribed Celestone, Marcaine, and Xylocaine after office visits. By telephone, she was prescribed pain medication on June 11, June 22, June 29, July 1, July 7, and July 17, 2009. Also, on April 20, 2009, she was given Demerol and Phenergan at the emergency room of Lafayette General for a re-injured shoulder and was given those same medications at the emergency room on August 1, 2009. Finally, medical records from South Kirby Pain Clinic in Texas indicate that she was prescribed Loratab, Xanax, and Soma on January 14, 2009, and April 22, 2009, for neck and shoulder pain.
C.C., C.W.C.'s father, testified he was incarcerated at Dixon Correctional Center due to a violation of probation regarding domestic violence charges, with a scheduled release date of August 23, 2010. He testified neither he nor the mother were capable of caring for their son. J.S., H.A.S.'s father, testified he was recently released from jail, his marriage to the mother was unstable, and there was domestic violence and drug use in the home. He testified neither he nor the mother were capable of caring for their daughter. J.S. is now deceased.
S.M.S.S. testified she loves her children and, if they are returned to her, she will provide them with a safe and stable home and environment. She is committed to maintaining sobriety. She has lived at the same address for over two years (at the time of trial), across the street from her mother and brothers, and has plans to add a third bedroom to her home so that each child could have his/her own bedroom. Regarding her employment, she worked at Home Furniture from June 2008 until February 2009 when she was forced to leave because OCS kept changing her visitation and home-visit schedule on short notice. She became employed at Brown's Furniture in March 2009 but lost that job after three months in connection with an incident of sexual harassment by a coworker. For the three months between May 2009 until the time of trial, she performed subcontracting work for various general contractors painting, flooring, and plumbing. She admitted she failed to provide verification of the work to her case worker on several occasions. She is planning to renew her contractor's safety license. In addition, she receives Social Security disability benefits sufficient to cover her rent, utilities and other living expenses.
S.M.S.S. testified that when she met with Dr. Bergeron in April 2007, she was *856 actively using cocaine and was under a great deal of stress and anxiety due to OCS taking custody of her children and the possibility that H.A.S. had been sexually assaulted. After OCS demanded she undergo another psychological evaluation, she had the evaluation at Freedom Recovery Center of Acadiana. She intended to attend aftercare at that facility but could not because of the expense.[6] Instead, she attended aftercare at Celebrate Recovery, held at her church and approved by the trial judge. She testified that after completing the inpatient treatment program at Southeast State Hospital on August 22, 2007, she relapsed once in November 2007 and as a result tested positive for cocaine in February 2008. She testified she has not used cocaine since November 2007 and could not explain how she tested positive for cocaine in January 2009, but added she also testified negative for cocaine in January 2009. No explanation was given as to why she also tested positive for cocaine on July 8, 2008. She testified that narcotic pain medication has at times been prescribed to her in connection with an arm and shoulder injury, and she has used it sparingly. She testified that Dr. Frentz prescribed Darvocet, Ultran, Ultracet, and Licderm patches for pain and that a "different hospital" prescribed Hydrocodone, Lortab and Valium. When presented with evidence that she visited South Kirby Pain Clinic in Texas in January and April of 2009, and was prescribed narcotic pain medication on both occasions, she explained that she visited the clinic while working in Houston on the recommendation of a friend. She testified she did not take much of the medication she was given in Texas, and the drugs were stolen by her then boyfriend, against whom she was ultimately forced to obtain protective orders. She remembers going to that pain clinic only once, despite documentary evidence to the contrary.
S.M.S.S.'s mother testified S.M.S.S. began using drugs in 1992 or 1993 when she met C.C. and had gone through three rehabilitation programs, the most recent being in July 2007. She testified she sees S.M.S.S. everyday and that she would know if S.M.S.S. were using drugs again. She testified that S.M.S.S. is back to "normal" since getting off of drugs and is a loving mother. Three friends testified they spend time with S.M.S.S., occasionally take her to aftercare at Celebrate Recovery, and would know if she were using drugs again. Another testified that he refers carpentry jobs to S.M.S.S.
At the conclusion of the evidence, the trial court granted OCS's "Petition for Termination of Parental Rights and Certification for Adoption," thereby terminating the parental rights of S.M.S.S. and both fathers. In written reasons for judgment, the trial court determined OCS proved by clear and convincing evidence that S.M.S.S. failed to substantially comply with the case plan. The trial court first found she had failed to obtain steady employment and that any income earned was "speculative at best." In addition, the trial court found her testimony that she was sober disingenuous in light of overwhelming *857 evidence that shows she continues to suffer from a substance abuse addiction:
More importantly, this Court finds that [S.M.S.S.] suffers from a substance abuse addiction that renders her incapable of exercising parental care for her two children. Throughout this process, [S.M.S.S.] has maintained that she has been drug free and is proud to point out that she regularly attends her after-care program. However, the evidence shows that [she] has failed to maintain her sobriety, through both use of prescription drugs and cocaine. Since her children have been removed from her, she has failed numerous drug tests and lied about obtaining prescription medication.
She was disingenuous during her trial testimony regarding her continued and current drug use. When confronted on cross examination, [she] admitted that she went to the South Kirby Pain Relief Clinic in Texas in January 2009, but stated that she did not take most of the medication prescribed. She denied going to the clinic a second time, even after being confronted with the records from the second visit in April 2009, wherein she obtained refills on her prescriptions. She testified that her boyfriend had taken the pain medication from the first visit and had no recollection of visiting the clinic again in April 2009. She had no explanation as to whether her boyfriend or anyone else took the medications prescribed on the second visit. It is important to note that at the very least, [she] fraudulently obtained almost 400 pills of prescription medication within a three month period. Additionally, [S.M.S.S.] filled the prescriptions from the pain clinic in Texas at a pharmacy in Washington, Louisiana, approximately fifty miles from her home, rather than the Walgreens in Scott, Louisiana, where she usually fills her prescriptions. [She] did not tell her own psychiatrist, Dr. Ulrich, about the pain clinic or the medications she had obtained from the clinic, and it appears to this Court that she was getting double doses of medications from two different doctors who didn't know about the other's existence. This Court can find no valid reason why [she] would (1) obtain additional prescription medication from a pain clinic in Texas, when she claims not to have taken all the first prescription; (2) fill only these prescriptions at a pharmacy in Washington, Louisiana; and (3) fail to tell her treating psychiatrist about the additional meds. In jury trials, the Court instructs the jury that if they find a witness to have lied in one respect, it may be presumed that their entire testimony is also a lie. This Court believes that she has been untruthful with regards to the pain medication obtained in Texas, and thus is concerned that all of her testimony about sobriety cannot be believed. Thus, due to her continued drug addiction, this Court finds it to be in the best interest of the children to terminate the parental rights of [S.M.S.S.].
The court of appeal reversed and reinstated S.M.S.S.'s parental rights. State in the Interest of H.A.S. and C.W.C., 09-1530 (La.App. 3 Cir. 6/2/10), 38 So.3d 1278. Regarding the mother's mental health issues, the court of appeal found as follows:
[S.M.S.S.] is required to provide OCS with a list of her prescribed medications and dosages and must see her doctor for follow-ups and medication management. Dr. Ed Bergeron did an initial evaluation on Appellant in April of 2007, and found that she needed to receive treatment and counseling. From that time forward, [she] has been receiving treatment from Dr. Susan Uhrich. Dr. Uhrich has treated [her] for post traumatic stress disorder, obsessive compulsive *858 disorder, and partial complex seizure disorder. She has also managed [her] medications. Dr. Uhrich has not provided any sort of psychological counseling to [her]. Despite not providing evidence of any psychological counseling, we find [she] has taken sufficient steps toward controlling and bettering her physical and mental health. Accordingly, we find that she has substantially complied with this aspect of her case plan.
38 So.3d at 1281. In addition, the court of appeal found S.M.S.S. substantially complied with the substance abuse portion of her case plan:
Because of her history of drug abuse, [S.M.S.S.]'s case plan called for her to live a clean and drug free life. She was required to complete an in-patient substance abuse treatment program, follow the after care recommendations of the treating clinicians, and submit to random drug screens. The record reveals that [she] attended and completed an in-patient treatment program at Southeast State Hospital and provided OCS with verification of the program. Thereafter she enrolled in an aftercare program at Celebrate Recovery.
[S.M.S.S.] has complied in submitting to random drug screens, but the results of those screens have come back positive for various narcotics. On multiple occasions, the screens have shown a positive test for cocaine. However, because of the many prescription medications [she] has been taking over the period, it is unclear to what degree [she] has deviated from her case plan. The State notes that along with testing positive for cocaine, [she] also tested positive for benzodiazepine, opiates, and barbiturates. The record indicates that all three of these substances can be found in the prescription medication that [she] has been taking in connection with treatment for a shoulder injury. For this reason, the court is more concerned with the tests that suggest cocaine use.
[S.M.S.S.] has tested positive for cocaine as recently [as] January 2009. [She] admits to having a relapse in November of 2007, thus explaining the positive test in February of 2008. However, she is adamant that she has been clean ever since. While she did test positive for cocaine in January of 2009, a test taken at a different clinic during the same week showed a negative result for cocaine. Furthermore, Dr. Ulrich testified at trial that she would have noticed had [she] resumed using cocaine and that she saw no signals that indicate a relapse.
While there is still a great level of concern with regard to [her] drug use, this court is encouraged by her progress in this area. In completing an in-patient program and continuing treatment in an aftercare program, we find that [S.M.S.S.] has displayed considerable effort in overcoming her problems. Accordingly, we find that she has substantially complied with this element of her case plan.
Id. at 1282. The court of appeal also found the mother's job as a carpenter fulfilled the case plan requirement for steady employment, and she had enrolled in parenting classes, maintained regular visitation, and maintained housing since July 2007, fulfilling those portions of the plan. Id. at 1282-83. Finally, the court of appeal found the mother has a reasonable expectation of improvement:
We note that in State in the Interest of L.L.Z. v. M.Y.S., 620 So.2d 1309, 1317 (La.1993), our supreme court found that "a reasonable expectation of reformation is found to exist if the parent has cooperated with state officials and has shown improvement, although all of the problems *859 that exist have not been eliminated." We find this language to be particularly significant to the case at issue. While it is true that Appellant has not resolved all of the problems that have plagued her in the past, particularly her failure to engage in psychological counseling and her struggle with cocaine addiction, it is clear that she has made great strides in becoming a better parent and citizen and that she has been notably cooperative with state officials throughout this process. Furthermore, as we have already mentioned, this court has been greatly encouraged by [the mother's] progress in completing an in-patient drug rehabilitation program at Southeast State Hospital and in continuing her aftercare treatment through Celebrate Recovery.
In light of [the mother's] continued cooperation with OCS and her considerable progress in bettering herself and creating a suitable environment for her children, we find that the State has failed to prove by clear and convincing evidence that there is no reasonable expectation of significant improvement in [the mother's] conduct or condition. Accordingly, we find the trial court was manifestly erroneous in its determination.
Id. at 1283. We granted OCS's writ application, giving the matter priority attention as required by La. Ch.C. art. 1001.1. State in the Interest of H.A.S. and C.W.C., 10-1529 (La.7/14/10), 39 So.3d 592.[7] The children remain in foster care pending this resolution.

DISCUSSION
An appellate court reviews a trial court's findings as to whether parental rights should be terminated according to the manifest error standard. State ex rel. K.G. and T.G., 02-2886 (La.3/18/03), 841 So.2d 759, 762. We have expressed the unique concerns present in all cases of involuntary termination of parental rights as follows:
In any case to involuntarily terminate parental rights, there are two private interests involved: those of the parents and those of the child. The parents have a natural, fundamental liberty interest to the continuing companionship, care, custody and management of their children warranting great deference and vigilant protection under the law, and due process requires that a fundamentally fair procedure be followed when the state seeks to terminate the parent-child legal relationship. However, the child has a profound interest, often at odds with those of his parents, in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, and continuous relationships found in a home with proper parental care. In balancing those interest, the courts of this state have consistently found the interest of the child to be paramount over that of the parent.
The State's parens patriae power allows intervention in the parent-child relationship only under serious circumstances, such as where the State seeks the permanent severance of that relationship in an involuntary termination proceeding. The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and adequate rearing by providing *860 an expeditious judicial process for the termination of all parental rights and responsibilities and to achieve permanency and stability for the child. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated. As such, the primary concern of the courts and the State remains to secure the best interest for the child, including termination of parental rights if justifiable grounds exist and are proven.
Title X of the Children's Code governs the involuntary termination of parental rights. La. Ch.C. art. 1015 provides the statutory grounds by which a court may involuntarily terminate the rights and privileges of parents. The State need establish only one ground, La. Ch.C. art. 1015, but the judge must also find that the termination is in the best interest of the child. La. Ch.C. art. 1039. Additionally, the State must prove the elements of one of the enumerated grounds by clear and convincing evidence to sever the parental bond. La. Ch. C. art. 1035(A).
State ex rel. K.G. and T.G., supra at 762; State ex rel. C.J.K., 00-2375 (La.11/28/00), 774 So.2d 107, 113; State in the Interest of J.A., 99-2905 (La.1/12/00), 752 So.2d 806, 810-811.
In this case, OCS sought to terminate S.M.S.S.'s parental rights pursuant to La. Ch.C. art. 1015(5), which provides:
Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.
The first requirement has been met as two years elapsed between the time the children were removed from the mother's custody pursuant to the court order until the petition for termination was filed.
The second requirement, lack of substantial compliance with the case plan, may be evidenced, as relevant to this case, by one of the following:
. . . .
(5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.
(6) The parent's lack of substantial improvement in redressing the problems preventing reunification.
(7) The persistence of conditions that led to removal or similar potentially harmful conditions.
La. Ch.C. art. 1036(C).
The third requirement, lack of any reasonable expectation of significant improvement in the parent's conduct in the near future, may be evidenced by the following:
(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.
La. Ch.C. art. 1036(D).
This Court has stated that "[w]hile a finding of mental illness, standing alone, is *861 insufficient grounds to warrant termination of [a parent's] parental rights, La. Ch.C. art. 1015, a mental deficiency related to the parenting ability is relevant in determining the role of the mother in abuse or neglect of the children." State ex rel. C.J.K., 774 So.2d at 116 (citing State in the Interest of J.A., supra, 752 So.2d at 814). In a case like this, the impairment must be such that the child is exposed to a substantial risk of serious harm, and the risk must be substantiated by testimony of a qualified expert or by an established pattern of the child's risk which has resulted from the parent's acts or omissions.
Here, the mother's substance abuse problem is our dominant concern, and the main reason termination was imposed by the trial court.[8] However, the only expert who testified her substance abuse could expose the children to a substantial risk of serious harm was Bergeron, and he had only seen her one time, immediately after the children were taken into state custody. No expert testified relative to the two years the mother had been working the case plan and getting treatment and assistance with her substance abuse issues. Secondly, there was no evidence of a "established pattern" demonstrating a risk to the children from the mother's acts during the time the children were in state custody. We can distinguish this case from State in the Interest of H.A.B., 10-1111 (La.10/19/10), 49 So.3d 345 wherein we recently ruled a mother's parental rights must be terminated. In that case, we stressed the "uncontradicted expert testimony in this case advocated termination because of the persistence of the conditions that led to removal, . . . as well as the lack of substantial improvement in redressing the problems preventing reunification,. . ., particularly the mother's and the child's mental health issues coupled with her childrearing attitudes." Id., at 368. In that case, two psychologists recommended termination based on evaluations and reports done as late as the month of trial. In this case, Bergeron testified he would not recommend reunification until S.M.S.S. completes her treatment and establishes a pattern of stability, but that was based on an evaluation done over two years before trial.
Other troubling issues in this case are the failed drug screens for narcotics, and the corresponding evidence that S.M.S.S. was being issued prescriptions for various narcotics by various doctors, some at the same time. For instance, while Dr. Ulrich did not prescribe narcotics, S.M.S.S. was able to obtain them from South Kirby Pain Clinic, her doctors at Hamilton Medical Group, and the emergency room at Lafayette General. Thus, the record seems to support the trial court's finding that she was "getting double doses of medications from two different doctors who didn't know about the other's existence." However, none of the prescribing doctors testified, and it is possible S.M.S.S. needed prescription medication for valid physical ailments. In any event, the record is not straightforward on this issue, and we are left with many unknowns. In addition, while S.M.S.S. tested positive for cocaine on February 16, 2007, December 4, 2007, February 19, 2008, July 8, 2008, and January 28, 2009, eight months elapsed between the last failed test and the trial. In addition, almost two years have now past since that last failed test. Based on this record, we are not convinced that termination is in the best interests of the children at this time.
However, the mother's apparent continued substance abuse concerns us enough *862 that we also do not believe reunification would be in the best interests of the children at this time. In ordering reunification, the court of appeal erred somewhat in relying on State in the Interest of L.L.Z. v. M.Y.S., 620 So.2d 1309 (La.1993), to find that S.M.S.S. has shown a reasonable expectation of improvement because she has "made great strides in becoming a better parent and citizen and that she has been notably cooperative with state officials throughout this process," as well as completing in-patient rehabilitation and continuing in aftercare treatment. 38 So.3d at 1283. In State in the Interest of L.L.Z., this Court held that "a reasonable expectation of reformation is found to exist if the parent has cooperated with state officials and has shown improvement, although all of the problems that exist have not been eliminated." 620 So.2d at 1317. After reviewing appellate court cases relying on that holding that placed too much emphasis of whether the parent had cooperated with OCS, we found the need to elaborate on that holding in State in the Interest of S.M., 98-0922 (La.10/20/98), 719 So.2d 445, 450-51. There, we held that instead of focusing on whether the parent had cooperated with OCS, the court should determine whether the evidence shows a significant and substantial indication of reformation from behavior which served as a basis for the State's removal of the children. Id. at 451. Here, the court of appeal should have focused more on the mother's substance abuse issues and the risks they posed to the children.
In any case, a court should not terminate parental rights unless it determines to do so is in the child's best interest. La. Ch.C. art. 1037(B). We note that the children's lawyer has represented to this Court that she adopts the mother's position in this case and is in favor of reunification. Even though we think the trial court's factual findings are not manifestly erroneous, we are not yet convinced that termination is in the children's best interest, nor are we convinced there is no reasonable expectation of significant improvement in the mother's conduct in the near future.
When the alleged grounds under La. Ch.C. art. 1039 are not proven by clear and convincing evidence, or the court finds that termination is not in the best interest of the child, the court may: (1) dismiss the petition; (2) reinstate the parent to full care and custody of the child; (3) if the child has been previously adjudicated as a child in need of care, reinstate that proceeding pursuant to Title VI; (4) upon a showing of sufficient facts, adjudicate the child in need of care in accordance with Title VI; (5) upon a showing of sufficient facts, adjudicate the family in need of services in accordance with Title VII; or (6) make any other disposition that is in the best interest of the child. State ex rel. K.G. and T.G., supra at 768.
Exercising our supervisory jurisdiction, we order that this case be remanded to the trial court for further proceedings and that a new plan, focusing on S.M.S.S.'s mental health and substance abuse issues, be in place for a period of nine months, after which the trial court shall conduct another termination hearing. In conjunction with that plan, S.M.S.S. shall be re-evaluated by Dr. Bergeron, (or be evaluated by any other doctor approved by the trial court), for a recommended course of mental health treatment if needed. Further, monthly drug tests shall be administered, and S.M.S.S. must present written prescriptions to the trial court for all prescription medications she is taking from this date through the trial date. For any positive drug test for any type of narcotic, S.M.S.S. must present medical testimony regarding any prescribed medications causing that positive test and the reasons *863 why the prescription was issued. Further, S.M.S.S. must present evidence from her treating physicians regarding any and all prescriptions issued. Any positive result for illegal drugs, such as cocaine, or narcotics unsupported by a valid prescription attested to by a physician, may be considered valid grounds for termination by the trial court.

DECREE
For the reasons stated herein, the judgment of the court of appeal is reversed, and the case is remanded to the trial court for further proceedings in accordance with this opinion.
REVERSED AND REMANDED.
GUIDRY, J., dissents.
CLARK, J., dissents and assigns reasons.
CLARK, Justice, dissents and assigns reasons.
I respectfully dissent from the majority opinion because I believe the focus of the majority is in error. Instead of focusing on the mother in this circumstance, our focus should be on the children who have been put at risk, and have suffered from this mother's inability to confront or conquer her addiction to drugs.
Even the majority admits the factual findings of the district court are not manifestly wrong. And those findings show us that this mother has lied about her continued and current drug use. She has taken extraordinary efforts to obtain prescription medication, even to crossing the state line to obtain prescriptions. She fills these prescriptions at a pharmacy at a distance from her home. Although the mother claims she is drug free and has maintained her sobriety, her actions show she is not only continuing with her usage of drugs, but the manner in which she does so indicates an awareness of her addiction at odds with her testimony.
I find, from the facts established by the trial court, that this mother has shown herself incapable of conquering her drug addiction and, despite attempts to comply with the requirement that she remain drug-free, has failed. The mother has had from 2007 to 2009 to focus her efforts on maintaining sobriety. Our focus must then shift to her children, who have been in foster care for a long period of time. The outcome of the majority's opinion is that these children will remain in limbo for an even longer period of time. For these reasons, I believe the proper course was to reinstate the trial court's opinion and terminate this mother's parental rights.
NOTES
[*] Retired Judge Philip C. Ciaccio, assigned as Justice ad hoc, sitting for Chief Justice Catherine D. Kimball.
[1] Specifically, OCS alleged the police had investigated a report of sexual abuse of H.A.S., and found sexual abuse had occurred while the child was in the care and custody of S.M.S.S., who provided no reasonable explanation for the abuse. Further, OCS alleged the mother had a longstanding and chronic substance abuse history and suspected she was using narcotics. In addition, the home was in extremely poor condition, and, after law enforcement officers told S.M.S.S. of the investigation and requested the children be left with relatives pending the investigation, S.M.S.S. made comments to the adults in possession of the infant that she needed to pick up the infant to visit an ailing relative in another state. Based on these statements, OCS determined she intended to flee with the children so OCS sought to place the children in protective custody. It was determined the sexual abuse was not committed by S.M.S.S., but it is unclear from the record who committed the abuse and who was caring for the child at that time.
[2] La. Ch.C. art. 1015(5) provides:

The grounds for termination of parental rights are:
. . .
Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable and permanent home.
[3] Her drug screen results are as follows: February 16, 2007, positive for cocaine; March 29, 2007, positive for benzodiazepines (temazepam) and propoxyphene; April 26, 2007, negative screen; May 31, 2007, positive for opiates (hydrocodone); September 24, 2007, positive for cocaine; December 4, 2007, positive for cocaine and benzodiazepines (oxazepam and temazepam); February 7, 2008, positive for barbiturates; February 19, 2008, positive for cocaine; July 8, 2008, positive for cocaine; August 14, 2008, negative screen; January 19, 2009, positive for opiates (hydrocodone); January 28, 2009, positive for cocaine; May 19, 2009, positive for opiates and benzodiazepines; May 20, 2009, refused test; August 13, 2009, negative screen; and August 21, 2009, negative screen.
[4] The post-traumatic stress disorder was the result of abuse by her ex-husbands.
[5] In Dr. Ulrich's opinion, S.M.S.S. had been misdiagnosed with bipolar disorder.
[6] Records from Freedom Recovery Center indicate she came in for an assessment on February 12, 2009, and had a psychiatric evaluation on March 2, 2009, where she reported she was taking Depakote and Cymbalta and had been sober for 17 months. She was diagnosed with major depression and substance dependency in remission. She attended one group therapy session on March 19, 2009, and one individual therapy session on March 12, 2009. She did not show up for a psychiatric consult on March 30, 2009, and attended no further sessions at Freedom Recovery. The treatment program at Freedom Recovery consists of 18 group therapy sessions and 6 individual sessions.
[7] Oral argument was continued from the September docket because the attorneys for OCS and the mother could not be present.
[8] While the trial court found her income was speculative at best, it found she had substantially complied with all areas of her plan except "maintenance of sobriety."